**Sen. William S. COHEN, et al., Plaintiffs,**

v.

**Donald RICE, Secretary of the Air Force, et al., Defendants.**

**Civ. No. 91–0282–B.**

United States District Court, D. Maine.

May 20, 1992.

---

1000

Severin M. Beliveau, Preti, Flaherty, Beliveau & Pachios, Augusta, Me., for plaintiffs.

Mark W. Batten, Trial Atty., Federal Programs Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiffs, United States Senators William S. Cohen and George J. Mitchell, United States Representative Olympia J.

Snowe, Governor John R. McKernan, Jr., the Towns of Limestown, Ashland, Caswell, Fort Fairfield, Mars Hill, New Sweden, Van Buren, the Cities of Caribou and Presque Isle, Aroostook County, the Save Loring Committee, Paul D. Haines, the American Federation of Government Employees Local Union Chapter # 2943 and Alan Mulherin, seek to enjoin the Secretary of Defense from carrying out the decision to close Loring Air Force Base ("Loring" or the "Base"), and refrain from taking any actions that may interfere with the ability of Loring to operate as if it was not slated for closure. Plaintiffs also request the Court to declare: (i) that the realignment recommendation to close Loring, provided by the Secretaries of the Air Force and Defense, to have been developed in a manner inconsistent with the requirements of the Base Closure Act, Pub.L. No. 101–510 Title XXIX ("Base Closure Act" or the "Act"); (ii) that the Secretaries' adoption of the closure recommendation, the findings and conclusions made by the Air Force with respect to the decision to close Loring to have been arbitrary and capricious and otherwise not in conformity with law; and (iii) that the closure and realignment recommendations submitted by the Commission to the President with respect to Loring to have been made in violation of the Act.

## I. BACKGROUND

This controversy revolves around the decision to close Loring. Loring, located in Limestone, Maine, is one of twenty-one Strategic Air Command Bases maintained by the Air Force in the continental United States. During April 1991, pursuant to the Base Closure Act, the Secretary of Defense recommended that fourteen Air Force facilities be closed, including Loring, and that six be realigned. *See* 56 Fed.Reg. 15184 (April 15, 1991). Thereafter, the Base Closing Commission engaged in an analysis and review of the Secretary's recommendations. The Commission ultimately recommended that one of the Air Force facilities

recommended for closure by the Secretary remain open, but concurred with the Secretary's recommendation that Loring be closed.

On July 10, 1991, President Bush approved the recommendations of the Commission. *See* 27 Weekly Comp.Pres.Doc. 930 (July 15, 1991). Following the President's approval, the House and Senate Armed Services Committees held hearings on the Commission's recommendations.

On July 30, 1991, as permitted by Section 2908 of the Act, the House considered a resolution, sponsored by Congressional plaintiff Rep. Snowe, to disapprove the Commission's recommendations. *See* 137 Cong.Rec. H6006 (daily ed. July 31, 1991). The House entertained floor debate on the proposal, including the objections of Rep. Snowe which parallel the allegations here set forth. *Id.* By a vote of 364 to 60, the House rejected the proposal, thus permitting the closure and realignment process to continue. *See* 137 Cong.Rec. H6039.

Having exhausted their remedies in the political arena, the plaintiffs brought their challenge to the Court. Defendants moved to dismiss the plaintiffs' complaint on February 28, 1992. The Court heard oral argument on May 4, 1992, and that motion is now before the Court.

## II. BALANCING TEST

The issue in this proceeding revolves around two competing interests that must be kept in balance. On the one hand, it is critical that base closings not be subject to the type of political and judicial delays that prompted the passage of the 1990 Act in the first instance. For more than a decade before the passage of the 1990 Act, nearly every attempt to close or realign a major base had been thwarted by Congress or the Courts.[1] The 1990 Base Closure Act's innovative scheme, utilizing an independent bi-partisan Base Closure Commission, short inflexible time-limits, an all or nothing vote

---

1. *See, e.g., Base Closure: Joint Hearings on H.R. 1583 to establish the Bipartisan Commission on Consolidation of Military Bases Before the Military Installations and Facilities Subcommittee of* the House Committee on Armed Services and Defense Policy Panel, 100th Cong.2d Sess. 349 (1988) (Statement of Rep. Armey).

by Congress to accept or reject the President's recommendation package in its entirety, and the exemption of the process from the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, "make it abundantly clear that speed and finality were regarded as indispensable components of the scheme." *Specter v. Garrett,* 971 F.2d 936, 958–59 (3d Cir.1992) (Alito, dissenting). *See also* 1990 U.S.Code Cong. & Admin.News 2931, 3257.

On the other hand, the Court must concern itself with the integrity of the process and the competing principle of fairness. One need look only as far as the Act's stated purpose to find Congress' insistence that the process must be both expeditious and fair. § 2901(b) ("to provide a fair process that will result in the timely closure and realignment of military installations inside the United States."). Basic procedural protections must be preserved in order to insure Congress' stated purpose to ensure that the interests of the communities would be heard and that the process and its consequences would be perceived by the people effected as fair, and would in fact be fair. Fairness must not be sacrificed on the alter of expediency. To the extent that judicial review is required, therefore, it must be preserved, albeit to a limited extent, to allow the Court to exercise its "balancing" responsibilities.

## III. ANALYSIS

 This case presents the same issues as were recently decided by the Third Circuit in *Specter v. Garrett,* 971 F.2d 936 (1992) (petition for rehearing *en banc* pending) (challenging the recommendations of the Secretary of the Navy and the Commission to close the Philadelphia Naval Shipyards), namely: (i) whether the plaintiffs have standing to sue; (ii) whether the controversy presents a nonjusticiable political question; and (iii) whether the decision to close and realign a base pursuant to the

Act is subject to judicial review. Although the decision reached in *Specter* is not binding upon this Court, the Third Circuit's analysis and conclusions, particularly with regard to the questions of the availability of judicial review and the applicability of the political question doctrine, are not without merit. The Court is persuaded by the reasoning of the court in *Specter* Parts III and IV, and adopts the Third Circuit's holdings with regard to judicial review and the political question doctrine. *Specter,* 971 F.2d at 943–55. With regard to the issue of standing, *Specter* Part II, the Court has written a separate analysis to more fully explain the basis for denying Defendants' motion to dismiss.

## A. STANDING TO SUE

### (i) *The Union*

 Standing is "the threshold question in every federal case, determining the power of the Court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). In essence, the inquiry into standing seeks to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations in its exercise." *Id.*

> Art III requires the party who invokes the Court's authority to show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the Defendant, and that the injury [2] fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision.

*Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

In this case, the union plaintiffs [2] clearly satisfy the "actual injury" requirement.

**2.** To attain representative standing the union must show that: its members individually would have standing to bring the same claims; the interests the union protected by bringing the claims are germane to the union's purposes; and neither the claim nor the relief sought re-

Many, if not all of the employees represented in this case will lose their jobs if the decision to close Loring is carried out. It is also indisputable that the injury the employees will suffer is exclusively traceable to the decision to close the Base. If Loring does not close the union's members will, in all likelihood, keep their jobs.

Plaintiffs' allegations demonstrate that Loring would not have been slated for closure but for the actions of the defendants. While it is true that the Act places in the President the authority to accept or reject the Commission's recommendations, the mere possibility that Congress or the President theoretically could have broken the causal link is insufficient to defeat standing in this case. Moreover, it is not correct to characterize the President's decision not to disapprove the Commission's recommendations as an independent decision unrelated to the Commission's recommendations. There *is* a but/for causation between the Secretary's decision to put Loring on the closure list, the Commission's recommendation to close Loring and the harm that may be visited upon the union plaintiffs.

Finally, it is clear that the harm the employees will suffer would be redressed, if only temporarily, as a result of the decision to close the Base being enjoined. The Base would remain open, at least temporarily, and as a consequence the employees' jobs would be spared for that period of time.

In addition to satisfying the constitutional requirements of injury in fact, fairly traceable causal connection, and redressibility, a plaintiff must also satisfy several prudential concerns regarding the proper exercise of federal jurisdiction. To this end, the Court has required "that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

As the Supreme Court stated in *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388,

399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987):

> The "zone of interest" test is a guide for deciding whether in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

Reviewing the Base Closure Act and its legislative history the Court finds that the Union and its members are within the zone of interests meant to be protected by the Act.

> [T]he Act demonstrates Congress' sensitivity to the impact of a base closing on the employees of the base and the community in which they live. Because of this sensitivity, Congress sought to ensure that the interest of the employees and their communities would be heard and that the process would be perceived as fair. To further this objective, Congress provided for opportunities for public hearings and comment. It also provided that if the national interest is found to outweigh those of the local community, economic assistance would be provided to assist in the period of transition.... [B]ecause of this congressional concern reflected in the Act and its legislative history, the base closing criteria established by the Secretary of Defense and left unaltered by Congress included among the eight factors to be considered "the economic impact on communities."

quires individual members to participate in the litigation. *Hunt v. Washington State Apple Advertising Comm'n* 432 U.S. 333, 343, 97 S.Ct.

2434, 2441, 53 L.Ed.2d 383 (1977). The Court finds in this case the union has met its burden.

*Specter*, 971 F.2d at 943 (citations omitted).[3]

## B. APPLICATION OF *SPECTER V. GARRETT* TO THE PLAINTIFFS' CLAIMS.

The Court, having adopted the Third Circuit's analysis with regard to the availability of judicial review, is left with the task of line drawing in order to determine which of Plaintiffs' claims are reviewable, and which are not. *See Specter*, 971 F.2d at 953–54.

■ Count I of Plaintiffs' complaint focuses on the alleged deficiencies in the performances of the Secretaries of the Air Force and Defense. Plaintiffs challenge the decision-making process of the Secretaries and allege that their recommendations deviated from the force structure plan and published criteria; that their recommendations were substantially in error; that they considered an unpublished criterion, "quality of life,"; that they relied on inaccurate and inadequate data and failed to explain these deficiencies to the Commission; that they disregarded their own prioritization schema in evaluating Loring; and that their recommendations were arbitrary and capricious.

Deficiencies in this category are not judicially reviewable. In each case the Court would be required to reevaluate the basis for the Secretaries' decision to close Loring and the relative importance of such data. The Court will not engage in such review for two reasons. First, "the Secretary's recommendations are clearly committed to his discretion under the Act." *Specter*, 971 F.2d at 950–51. Second, and perhaps more importantly, Congress provided for alternative methods of review.

Congress anticipated that questions would be raised about the adequacy of the Secretary's data and analysis. It decided to put these questions to rest and guaranty the integrity of the process not through judicial review, but through review by two bodies far more suited to the task: the Commission, and the GAO.

*Id.* at 951. *See e.g.*, § 2903(d)(2)(B) (the Commission shall review the recommendations of the Secretary and may make changes in any of the recommendations "if the Commission determines that the Secretary deviated substantially from the force-structure plan and the final criteria referred to in subsection (c)(1) in making recommendations."); § 2903(d)(2)(5) (the Comptroller General shall "transmit to Congress and to the Commission a report containing a detailed analysis of the Secretary's recommendations and selection process.").

"Given the nature of this task, it seems clear ... that an additional review by the courts would not contribute to public confidence in this part of the process...." *Specter*, 971 F.2d at 951. The Court finds, therefore, that Plaintiffs' allegations in Count I paragraphs 61–67 (first sentence) and 68(B)–(F) to be unreviewable. Accordingly, Defendants' motion to dismiss is GRANTED with respect to these claims.

■ However, with regard to Plaintiffs' contention that the Secretary failed to transmit to the GAO, members of Congress and the Commission all of the information used in making the base closure recommendations, the Court finds this claim to be judicially reviewable. The Commission and the GAO are the bodies charged with the review of the Secretary's recommendations. These bodies must, therefore, have access to all of the information the Secretary relied upon. *See* § 2903(c)(4). The failure to transmit such information "presents the kind of issues with which courts

---

**3.** As a matter of judicial economy, generally courts will not adjudicate the standing of each multi-party plaintiff, as long as one plaintiff is found to have standing. Having found such a plaintiff in this case, the Court elects not to resolve the standing issue as to the remaining plaintiffs. The Court notes, however, that this prudential doctrine does not absolve plaintiffs' counsel of its responsibility to ensure that each plaintiff named may properly invoke the jurisdiction of the Court. *See* Fed.R.Civ.P. 11.

have traditionally dealt.... [S]uch a review seems entirely consistent with Congress' desire to assure the integrity of the decision-making processes." *Specter*, 971 F.2d at 952.[4]

 With regard to Count II, the plaintiffs challenge the decision-making process by which the Commission reviewed the Secretary's recommendations. Specifically the plaintiffs charge that the Commission: utilized an unpublished criterion; failed to apply the published criteria equally to all installations; failed to follow the Air Force's priority schema; and utilized data it knew to be in substantial error.

The Court finds that "each of these challenges go to the merits of the recommendations of the Commission and that the merits of those recommendations, like the merits of the recommendations of the Secretary, are not subject to second guessing by the judiciary." *Id.* at 952–53. Accordingly, the Court finds paragraphs 69, 70(a), (c)–(e) are not judicially reviewable and are hereby

DISMISSED.

Plaintiffs' contention that the Commission failed to hold public hearings as required by the Act, § 2903(d)(1), is subject to judicial review. Such review is "entirely consistent with the congressional intent, [as] reflected in the Act and its legislative history. By so holding, we do not, of course, endorse the proposition that the Commission's failure to reopen its hearings was in conflict with 2903(d)(1)." *Specter*, 971 F.2d at 960–61.

The Court notes that its finding that a small category of claims in this proceeding is subject to judicial review does not

necessarily mandate judicial relief. Whether or not a violation receives a remedy is something that a court must determine through an exercise of discretion based on the character of the viola-

tion and all the surrounding circumstances. Thus judicial review does not mean that any technical defalcation will invalidate the package and require that the process be repeated from square one. *Id.* at 950–51.

Accordingly, Defendants' motion to dismiss is *GRANTED* in part, and *DENIED*, in part. Specifically, Defendants' motion to dismiss is *DENIED* with respect to paragraphs 64(d), 67 (second sentence), 68(A), 70(a)–(b). Given the nature of the complaint and the issues involved, the Court will hear this case on an expedited basis. The Court will hold a scheduling conference within one week from the date of this order.

SO ORDERED.

---

**4.** However, to the extent that the claim is that because of the Air Forces' concealment or errors, the Secretary of Defense failed to consider evidence that he should have considered, judicial review is not available.