United States Court of Appeals

For the First Circuit

____________________

No. 92-2427

WILLIAM S. COHEN, ET AL.,

Plaintiffs, Appellants,

v.

DONALD RICE, SECRETARY OF THE AIR FORCE, ET AL.,

Defendants, Appellees.

____________________

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

____________________

Before

 Boudin, 
Circuit Judge
,

Campbell, 
Senior Circuit Judge
,

and Stahl, 
Circuit Judge
.

____________________

Severin M. Beliveau
, with whom 
Ann R. Robinson
, 
Joseph G. Donahue
, and 
, were on brief for appellants.

Jacob M. Lewis
, with whom 
Stuart M. Gerson
, Acting Attorney General, 
Richard S. Cohen
, United States Attorney, 
Douglas N. Letter
, United States Attorney and 
Scott R. McIntosh
, United States Attorney, were on brief for appellee.

____________________

May 3, 1993

____________________

STAHL, 
Circuit Judge
. This is an action to enjoin the Department of Defense from carrying out the President's decision to close Loring Air Force Base ("Loring") in Limestone, Maine. Plaintiffs,
1:

et
 
seq.
See
 
Cohen
 v. 
Rice
, 800 F. Supp. 999 (D. Me. 1992) ("
Cohen I
"). In September of 1992, the district court granted defendants' motion for summary judgment on the remaining claims on the basis of the Supreme Court's intervening decision in 
Franklin
 v. 
Massachusetts
, 112 S. Ct. 2767 (1992). 
See
 
Cohen
 v. 
Rice
, 800 F. Supp. 1006 (D. Me. 1992) ("
Cohen II
"). Plaintiffs' timely appeal focuses on the district court's application of 
Franklin
 to this case. After careful review of the decision below, the 1990 Act, and the Court's pronouncements in 
Franklin
, we affirm the judgment of the district court. As this case is apparently the first at the appellate level to mesh the 1990 Act with the recent dictates of 
Franklin
,
2:
One other appellate court has addressed the issue we face today, deciding, at least partially, in favor of judicial review. 
See
 
Specter
 v. 
Garrett
, 971 F.2d 936 (3rd Cir. 1992). The district court, in fact, relied on 
Specter
 in ruling on defendants' motion to dismiss. Subsequently, however, following the issuance of 
Franklin
, the Court granted the government's petition for certiorari in 
Specter
, vacated the judgment therein, and remanded the case to the Third Circuit for reconsideration in light of 
Franklin
. 
See
 
O'Keefe
 v. 
Specter
, 113 S. Ct. 455 (1992).

 we begin with an overview of the 1990 Act and its predecessors, and then focus on the specifics of the matter at hand.

The 1990 Act

The 1990 Act is the latest attempt by Congress to regulate the process by which domestic military bases are closed or realigned. Throughout the 1960s and 1970s, the Executive Branch attempted to reduce military expenditures by closing or realigning military bases. 
See
 Defense Base Closure and Realignment Commission, 
Report to the President
, ("Commission Report") at 1-1 (1991). Often, however, these attempts were opposed by members of Congress, who feared the economic impact on their constituents, and who suspected the influence of political motivation in the Executive's decisions. 
Id.

See

Id.
 While the 1977 legislation imposed few substantive restrictions on the Executive Branch's authority to close bases, the procedural requirements--most notably the mandate to comply with NEPA--made such action difficult. 
See
 
Commission Report
see
 
also
 H.R. Conf. Rep. No. 1071, 100th Cong., 2d Sess. 23 (1988), 
reprinted
 
in
 1988 U.S.C.C.A.N. 3395, 3403 ("[t]he conferees recognize that [NEPA] has been used in some cases to delay and ultimately frustrate base closures . . . .").

Id.
Id.
Id.
Although the newer processes of the 1988 Act led to closure or realignment of 145 domestic military bases, it was not enacted as a permanent mechanism, but was instead a one-time exception to the procedures set forth in the 1977 legislation. 
See
 
Specter
, 971 F.2d at 939. Thus, the Defense Secretary's January 1990 base closure proposals were governed by the 1977 rules. 
Id.
 Members of Congress expressed concern over the "considerable period of time and . . . numerous opportunities for challenges in court[]" presented by the 1977 procedures, and noted that the Secretary's list of bases for study "raised suspicions about the integrity of the base closure selection process." H.R. Conf. Rep. No. 923, 101st Cong., 2nd Sess. 705 (1990), 
reprinted
 
in
 1990 U.S.C.C.A.N. 2931, 3257.

Congress, in enacting the 1990 Act, attempted to incorporate the procedures of the 1988 Act, without the obstacles of prior legislation. 
See
 H.R. Rep. No. 665, 101st Cong., 2d Sess. 342 (1990), 
reprinted
 
in
Id.
Id.

In selecting military installations for closure or realignment, the Department of Defense, giving priority consideration to military value (the first four criteria below), will consider:

Military Value

1. The current and future mission requirements and impact on operational readiness of the Department of Defense's total force.

2. The availability and condition of land, facilities and associated air space at both the existing and potential receiving locations.

3. The ability to accommodate contingency, mobilization and future total force requirements at both the existing and potential receiving locations.

4. The cost and manpower implications.

Return on Investment

5. The extent and timing of potential cost and savings, including the number of years, beginning with the date of completion of the closure or realignment, for the savings to exceed the cost.

Impacts

6. The economic impact on communities.

7. The ability of both the existing and potential receiving communities' infrastructure to support forces, missions and personnel.

8. The environmental impact.

56 Fed. Reg. 6374-02 (Feb. 15, 1991).

For the 1991 cycle, the Act required the Secretary to recommend base closures and realignments to the Commission by April 15, 1991, based on the force structure plan and final criteria. 
Id.
Id.

Id.
Id.
Id.
Once the Commission completes its report, the Act requires that it be transmitted to the President, who may approve or disapprove the Commission's recommendations, and then must relate his decision to the Commission and Congress. 
Id.
Id.
Id.
Id.
Id.
Id.
The Loring Decision

In April 1991, the Secretary issued his list of recommended domestic base closures and realignments. 
See
 56 Fed. Reg. 15184 (April 15, 1991). Among the 72 military installations on the list were 20 Air Force bases. Loring was scheduled for closure. 
Id.
 at 15252. Pursuant to the Act, the Commission then conducted its analysis and review of the Secretary's recommendations. The Commission conducted public hearings, at which it heard testimony from Department of Defense officials, legislators, and other experts. Commission Report at 4-1, (G-1)-(G-2). Commissioners also visited many of the affected bases, including Loring. 
Id.
 at 4-1, H-1. The Commission's staff reviewed the military services' methodologies and data used to develop their recommendations. 
Id.
 In addition, the General Accounting Office ("GAO") issued a report on the Secretary's recommendation and forwarded it to the Commission, while also assisting the Commission in obtaining, verifying and reviewing data. 
Id.
 at (3-1)-(3-2). In the end, the Commission recommended that one of the Air Force bases targeted for closure by the Secretary remain open, but the Commission concurred in the recommendation that Loring be closed. 
Id.
 at (5-31)-(5-45).

On July 10, 1991, President Bush approved the recommendations of the Commission, including the closure of Loring. 
See
 
Cohen I
Cohen II
, 800 F. Supp. at 1008. On July 30, 1991, pursuant to section 2908 of the 1990 Act, the House considered a resolution, proposed by plaintiff Rep. Snowe, to disapprove the Commission's recommendations. 
Id.
 Three Commissioners, Air Force officials, and members of the affected communities testified at the hearings. 137 Cong. Rec. H6006 (daily ed. July 31, 1991). During the course of debate, Representative Snowe urged the House to block Loring's closure, alleging a variety of procedural errors on the part of the Commission. 
Id.
 at H6012-H6020. The House rejected the proposed disapproval resolution by a vote of 364 to 60, thus requiring the Secretary to proceed with the 1991 closures and realignments. 
Id.
 at H6039.

Prior Proceedings

In February 1992, the defendants moved to dismiss the suit, essentially on the ground that the 1990 Act implicitly precluded judicial review. 
Cohen I
, 800 F. Supp. at 1005. With respect to Count I, the district court dismissed all claims against the Air Force and Secretary, except those containing allegations that the Secretary failed to transmit to the GAO, Congress and the Commission all of the information used in preparing his recommendations, as the 1990 Act requires. 
Id.
 The court ruled that the remainder of plaintiffs' challenges were not judicially reviewable because they would require the court to "reevaluate the basis for the Secretaries' decision to close Loring. . . ." Relying on 
Specter
, the court held that such review was precluded by the Act, which "decided to put these questions to rest and guaranty the integrity of the process not through judicial review, but through review by two bodies far more suited to the task: the Commission and the GAO." 
Id.
 at 1005 (quoting 
Specter
, 971 F.2d at 951). The district court also dismissed most of the claims against the Commission made in Count II, for essentially the same reasons. 
Id.
 at 1006. Only the charge that the Commission failed to hold public hearings, in violation of section 2903(d)(1) of the 1990 Act, was left standing. 
Id.

 Subsequent to 
Cohen I
, the Supreme Court, in 
Franklin
, expressed its interpretation of reviewable agency action under the APA. The district court, relying on 
Franklin
, granted defendants' motion for summary judgment on the remaining aspects of the case. 
See
 
Cohen II
. This appeal followed. Before delving into 
Franklin
 and its applicability herein, we briefly outline the strictures of the APA.

The Administrative Procedure Act

The APA sets forth the procedures by which federal agencies are held accountable to the public and their actions made subject to judicial review. 
Franklin

Cohen II
, 800 F. Supp. at 1009 (quoting 5 U.S.C. 701(a)). Finally, and perhaps most importantly, the APA authorizes judicial review only of "
final

Franklin
, the Court addressed this critical issue. We turn now to the Court's opinion.

Franklin v. Massachusetts

Franklin
Id.
Id.
See
 
generally
 
Franklin
, 112 S. Ct. at 2771 (outlining historical bases of apportionment and census statutes).

The Commonwealth of Massachusetts challenged the Secretary of Commerce's inclusion of military personnel serving overseas in state population counts for census purposes. The resulting tabulation shifted a Representative from Massachusetts to Washington. 
Id.
 Massachusetts claimed that the allocation of overseas personnel was arbitrary and capricious under the APA. A three-judge district court panel agreed. 
Commonwealth
 v. 
Mosbacher
, 785 F. Supp. 230 (D. Mass. 1992). The Supreme Court reversed, holding that the action of the Secretary, in reporting the population tabulations, was not "final," within the meaning of the APA, while the actions of the President were not subject to APA review because the President is not an "agency" within the APA. 
Franklin
, 112 S. Ct. at 2773-76.

In assessing the finality of the Commerce Secretary's actions,
4:
Here, plaintiffs have expressly conceded that they are not attacking the actions of the President. Thus, we focus our discussion on 
Franklin's
 assessment of the Secretary of Commerce's actions.

 the Court first looked to 
Abbott Lab.
 v. 
Gardner
, 387 U.S. 136 (1967). There, the Court stated that the finality of agency action depends on whether its impact `"is sufficiently direct and immediate' and has a `direct effect on . . . day-to-day business.'" 
Franklin
, 112 S. Ct. at 2773 (quoting 
Abbott
, 387 U.S. at 152). "An agency action is not final if it is only `the ruling of a subordinate official' or `tentative.'" 
Id.
 (quoting 
Abbott
, 387 U.S. at 151). "The core question is whether the agency has completed its decisionmaking [sic] process, and whether the result of that process is one that will directly affect the parties." 
Id.
 In answering this "core question," the Court first reasoned that the census statute, unlike others, does not explicitly require the President to transmit the agency's report to Congress. 
Id.
 The Court stated:

Id.
 at 2774.

Therefore, according to the Court, the census itself still presents a "moving target" after the Secretary reports to the President, especially since there exists no statutory bar to the President instructing the Secretary to reform the census, even after the President receives the Secretary's report. 
Id.

Id.
 Thus, the Court concluded: "Because the Secretary's report to the President carries no direct consequences for the reapportionment . . . serv[ing] more like a tentative recommendation than a final and binding determination[,] [i]t is, like `the ruling of a subordinate official,' not final and therefore not subject to review." 
Id.
 (quoting 
Abbott
, 387 U.S. at 151).

We agree with the district court's conclusion that "[t]he holding and reasoning of 
Franklin
 are directly applicable to the facts of the present controversy." 
Cohen II
, 800 F. Supp. at 1011. In arriving at its decision, the 
Franklin
 Court explicitly distinguished statutory schemes whereby the President is 
required
 to transmit an agency's report directly to Congress from those in which the President is not so required, holding that the former represent final agency action, under the APA, but that the latter do not.

Under the 1990 Act, the President is not required to submit the Commission's report to Congress. In addition, the 1990 Act gives the President the power to order the Commission to revise its report, and, in the final analysis, the President has the power to terminate a base closure cycle altogether via a second rejection of a Commission report. In our view, the agency action involved here bears even less indicia of finality than that in 
Franklin
, where the majority referred to the President's role in reapportionment as "admittedly ministerial," 
id.
 at 2775, yet still found the President's action to be the "final action." 
Id.

Plaintiffs seek to avoid 
Franklin's
 restrictions by arguing that this case involves a challenge to the Commission's faulty 
procedures
, e.g., failing to hold public hearings and failing to provide information to Congress and the GAO, whereas 
Franklin
, according to plaintiffs, proscribes only challenges to an agency's substantive decisions. As an initial matter, we note that 
Franklin 
makes no such distinction. In any event, we view it as a distinction without legal difference. As previously noted, 
Franklin's
 finality determination explored whether an agency action has a "sufficiently direct and immediate" impact. Here, if the Commission's report to the President is not a "final action," then the techniques used by the Commission to create the report, which are even more preliminary to the final decision, cannot themselves be "final agency actions." In sum, whether the complaints are styled as procedural or substantive, our answer to the "core question" of finality remains the same. The judgment of the district court is therefore 
affirmed.
5:
Because we have based our decision on 
Franklin's
 finality analysis, we need not address whether the 1990 Act, by its own terms, precludes judicial review.