971 F.2d 936
 60 USLW 2686
 Sen. Arlen SPECTER; Sen. Harris Wofford; Sen. Bill
Bradley; Sen. Frank R. Lautenberg; Governor Robert P.
Casey; Commonwealth of Pennsylvania; Ernest D. Preate,
Jr., Pennsylvania Attorney General; Rep. Curt Weldon, Rep.
Thomas Foglietta; Rep. Robert Andrews; Rep. R. Lawrence
Coughlin; City of Philadelphia; Howard J. Landry;
International Federation of Professional and Technical
Engineers, Local 3, William F. Reil; Metal Trades Council,
Local 687 Machinists; Governor James J. Florio; State of
New Jersey; Robert J. Del Tufo, New Jersey Attorney
General; Governor Michael N. Castle; State of Delaware;
Rep. Peter H. Kostmeyer; Rep. Robert A. Borski, Ronald
Warrington; Planners Estimators Progressman & Schedulers
Union Local No. 2
v.
H. Lawrence GARRETT, III, Secretary of the Navy; Richard
Cheney, Secretary of Defense; the Defense Base Closure and
Realignment Commission, and its Members; James A. Courter;
William L. Ball, III; Howard H. Callaway; Duane H.
Cassidy; Arthur Levitt, Jr.; James C. Smith, II; Robert
D. Stuart, Jr.,
U.S. Sen. Arlen Specter, U.S. Sen. Harris Wofford, U.S. Sen.
Bill Bradley, U.S. Sen. Frank R. Lautenberg, Governor Robert
P. Casey, the Commonwealth of Pennsylvania, Pennsylvania
Attorney General Ernest D. Preate, Jr., Governor James J.
Florio, the State of New Jersey, New Jersey Attorney General
Robert J. Del Tufo, Governor Michael N. Castle, the State of
Delaware, U.S. Rep. Curt Weldon, U.S. Rep. Thomas Foglietta,
U.S. Rep. Robert E. Andrews, U.S. Rep. R. Lawrence Coughlin,
U.S. Rep. Peter H. Kostmayer, U.S. Rep. Robert A. Borski,
the City of Philadelphia, Howard J. Landry, International
Federation of Professional and Technical Engineers, Local 3,
William F. Reil, Metals Trades Council, Local 687,
Machinists, Ronald Warrington, the Planners Estimators
Progressman & Schedulers Union, Local No. 2, Appellants.
 No. 91-1932.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 28, 1992.
Decided April 17, 1992.
Rehearing and Rehearing In Banc Denied May 20, 1992.
 
 Bruce W. Kauffman (argued), David H. Pittinsky, Camille Wolf Spiniello, Patrick T. Davish, Mark A. Nation, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa. (Senator Arlen Specter (argued), of counsel), for appellants.
 Ernest D. Preate, Jr., Atty. Gen. for Pa., Louis J. Rovelli, Executive Deputy Atty. Gen. for Pa., Harrisburg, Pa., for Com. of Pa. and Ernest D. Preate, Jr.
 Robert J. Del Tufo, Atty. Gen. of N.J., Jack M. Sabatino, Asst. Atty. Gen. of State of N.J., Howard J. McCoach, Deputy Atty. Gen., State of N.J., Trenton, N.J., for the State of N.J., Governor James J. Florio and Robert J. Del Tufo.
 Charisse Lillie, Sol. for the City of Philadelphia, Philadelphia, Pa., for City of Philadelphia.
 Stuart M. Gerson, Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., Douglas N. Letter, Scott R. McIntosh (argued), Jennifer H. Zacks, Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellees.
 Before STAPLETON, SCIRICA and ALITO, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 I.
 
 1
 This is an action to enjoin the Secretary of Defense from carrying out a decision to close the Philadelphia Naval Shipyard ("Shipyard"). The plaintiffs-appellants ("plaintiffs") are Shipyard workers; their unions; members of Congress from Pennsylvania and New Jersey; the States of Pennsylvania, New Jersey, and Delaware, and officials of those States; and the City of Philadelphia. The defendants-appellees ("defendants") are the Secretary of Defense, the Secretary of the Navy, and the independent Defense Base Closure and Realignment Commission ("Commission") and its members.
 
 
 2
 The Defense Base Closure and Realignment Act of 1990 ("the Act") is the latest in a series of statutes enacted by Congress during the past fifteen years to regulate the process by which domestic military bases are closed and realigned. In 1977, Congress passed legislation allowing the Secretary of Defense to close a particular base only after (1) notifying the Committees on Armed Services of the Senate and House of Representatives of the bases selected for closure; (2) submitting to these Committees an evaluation of the various consequences of the closure (including the local economic, environmental, budgetary and strategic consequences); and (3) deferring action for at least sixty days, during which time Congress could act legislatively to halt the closure or realignment. 10 U.S.C. § 2687(b) (Supp.IV 1980). The statute also required the Secretary to comply with the requirements of the National Environmental Policy Act of 1969 ("NEPA"). Id.
 
 
 3
 Eleven years later, Congress enacted the Defense Authorization Amendments and Base Closure and Realignment Act of 1988, the immediate predecessor of the 1990 Act. Pub.L. No. 100-526, §§ 201-209, 102 Stat. 2623, 2627-34 (1988). Under the 1988 Act, the Secretary of Defense could no longer unilaterally choose bases for closure. Instead, that Act vested a new independent commission with the power to recommend bases for closure. Id. §§ 201(1), 203(b)(1-2), 102 Stat. at 2627-28. These recommendations were to be presented to the Secretary of Defense for approval or disapproval in their entirety. Id. §§ 201(1), 202(a)(1), 102 Stat. at 2627. If the Secretary approved the recommendations, the 1988 Act gave Congress 45 days within which to disapprove them. Id. § 202(b), 102 Stat. at 2627. The 1988 Act explicitly exempted the base closure decisions of the Commission and the Secretary from the requirements of NEPA. Id. § 204(c)(1), 102 Stat. at 2630. The legislative history of the 1988 Act indicates that Congress dropped the NEPA requirements in an effort to avoid delays.[1]
 
 
 4
 The 1988 Act was not a permanent mechanism for closing and realigning military installations, but was rather a one-time exception to the process set forth in the 1977 legislation. In January 1990, in actions governed only by the 1977 Act, the Secretary of Defense proposed another round of closures. Members of Congress voiced concern about the Secretary's decisionmaking having "raised suspicions about the integrity of the base closure selection process." H.R.Conf.Rep. No. 923, 101st Cong., 2d Sess. 705 (1990) ("House Conference Report"), reprinted in 1990 U.S.C.C.A.N. 2931, 3110, 3257. Moreover, House conferees later noted that base closures and realignments under the 1977 legislation took "a considerable period of time and involve[d] numerous opportunities for challenges in court." House Conference Report at 705, 1990 U.S.C.C.A.N. at 3257.
 
 
 5
 Congress subsequently enacted the Defense Base Closure and Realignment Act of 1990. Section 2901 of this Act declares that the law's purpose "is to provide a fair process that will result in the timely closure and realignment of military installations inside the United States." Pub.L. No. 101-510, § 2901(b), 104 Stat. 1808 (1990).[2] The Act, which governs three rounds of base closures (in 1991, 1993, and 1995), retains the basic features of the 1988 Act. An independent Commission, to be appointed by the President with the advice and consent of the Senate, is to meet in each of the three years. § 2902(a), (e). The Secretary of Defense must provide Congress and the Commission with a six-year "force structure plan" that assesses national security threats and the force structure needed to meet them. § 2903(a)(1)-(2). The Act also requires the Secretary to formulate criteria for use in identifying bases for closure or realignment; these criteria must be published in the Federal Register for public notice and comment, and they must be presented to Congress which evaluates and may disapprove them. § 2903(b).
 
 
 6
 For the first round of base closures, the Act requires the Secretary to recommend base closures and realignments by April 15, 1991, based on the force structure plan and final criteria. § 2903(c)(1). The Commission is then charged with reviewing these recommendations and with the preparation of a report for the President containing its assessment of the Secretary's proposals and its own recommendations for base closures. § 2903(d)(2). The Act requires the Commission to hold public hearings on the Secretary's recommendations, § 2903(d)(1), and authorizes the Commission to change any of the Secretary's recommendations if they "deviate[ ] substantially" from the force structure plan and the final criteria. § 2903(d)(2)(B). In its report to the President, the Commission must justify any departure from the Secretary's list of recommendations. § 2903(d)(3). The Commission is to be assisted in its task by the General Accounting Office ("GAO"), to which the Secretary must give all information used in making his initial recommendations, § 2903(c)(4), and which must report on the Secretary's recommendations to Congress and the Commission, § 2903(d)(5).
 
 
 7
 Once the Commission has made its recommendations, the Act requires that they be presented to the President for his review. § 2903(e). The President may approve or disapprove the Commission's recommendations in whole or in part, and must transmit his determination to the Commission and Congress. § 2903(e)(2)-(3). If the President approves the Commission's recommendations, Congress has 45 days from the date of this approval to pass a joint resolution disapproving of the Commission's recommendations in their entirety. §§ 2904(b), 2908. If such a resolution is enacted, the Secretary of Defense may not close the bases approved for closure by the President. § 2904(b). If the President disapproves the Commission's recommendations in whole or in part, he returns them to the Commission. The Commission reconsiders its recommendation in light of the President's actions and resubmits a revised list for the President's consideration. § 2903(e)(3). If the President does not transmit to Congress an approved list of recommendations by September 1 of any year in which the Commission has transmitted recommendations to the President, the base closure process for that year is terminated. § 2903(e)(5).
 
 
 8
 The Act contains several important provisions which were absent from predecessor base closure statutes, including, inter alia, the requirement that the Commission hold public hearings on the Secretary of Defense's closure recommendations, § 2903(d)(1); the requirement that all meetings of the Commission be open to the public, except where classified information is being discussed, § 2902(e)(2)(A); the requirement that a force structure plan be prepared, § 2903(a); the requirement that final criteria be developed, published and submitted for congressional consideration, § 2903(b)-(c); the requirement that the Secretary consider all military installations "equally without regard to whether or not the installation has been previously considered or proposed for realignment," § 2903(c)(3); and the requirement that the Secretary transmit to the Comptroller General "all information used by the Department in making its recommendations to the Commission for closures and realignments" so that the GAO can analyze the Secretary's recommendations and aid the Commission in its deliberations, §§ 2903(c)(4), 2903(d)(5)(A)-(B).
 
 
 9
 In April 1991, the Secretary of Defense recommended the closure or realignment of a long list of domestic bases including twelve naval facilities. See 56 Fed.Reg. 15184 (April 15, 1991). Among the naval facilities recommended for closure was the Shipyard. The Commission subsequently held public hearings in Washington, D.C., and Philadelphia. During these hearings the Commission heard testimony from Department of Defense officials, legislators, and other experts. The Commissioners visited the major facilities recommended for closure, including the Shipyard. The GAO forwarded to the Commission a report on the Secretary's recommendations and assisted the Commission in its analysis of the Secretary's recommendations.
 
 
 10
 The Commission ultimately recommended that two of the naval facilities that the Secretary recommended for closure remain open, but concurred with the Secretary's recommendation that the Shipyard be closed. In all, the Commission recommended to the President that 34 installations be closed and 48 realigned. 1991 Defense Base Closure and Realignment Report to the President at vii-viii. President Bush approved all of the recommendations of the Commission, including the closure of the Shipyard. Following the President's approval, the House and Senate Armed Services Committees held hearings on the Commission's recommendations. On July 30, 1991, the House rejected a proposed resolution of disapproval of the Commission's recommendations by a vote of 364-60, thus authorizing the Secretary to proceed with the closures and realignments. 137 Cong.Rec. H6006 (daily ed. July 30, 1991).
 
 
 11
 Plaintiffs[3] filed their original complaint in the district court on July 8, 1991, and an amended complaint on July 19, 1991.[4] In the amended complaint, plaintiffs allege that defendants[5] violated various provisions of the Act.
 
 
 12
 To summarize briefly the allegations: In Count I plaintiffs allege that the Secretaries of Defense and the Navy violated the Act by withholding information pertinent to the decisionmaking process, by failing to apply the final criteria and force structure plan evenhandedly to all installations, and by failing to implement record-keeping and internal controls. In Count II, plaintiffs charge the Commission with violating the Act by basing its decisions on information supplied by the Navy but not made available to the GAO, Congress or the public, by failing to apply the final criteria and force structure plan evenhandedly, and by ignoring the conclusions of the GAO. Finally in Count III, the Shipyard employee and union plaintiffs charge all defendants with violating their due process rights under the Fifth Amendment to the Federal Constitution by disregarding the procedures set forth in the Act in deciding to close the Shipyard.
 
 
 13
 Plaintiffs filed motions for a preliminary injunction and expedited discovery in July. On August 16, defendants filed a motion to dismiss. After a hearing on October 25, 1991, the district court issued its order dismissing the complaint with prejudice on November 1, 1991. The district court found that the legislative history of the Act, as well as the law's purpose to provide for timely closure of military bases, indicate a clear legislative intent to preclude judicial review. Specter v. Garrett, 777 F.Supp. 1226, 1227-1228 (E.D.Pa.1991). As an alternative ground for its holding, the court held that this case is one which is "impossible for the court to resolve independently without expressing lack of respect due the coordinate branches of government," id. at 1229, and as a result presents a nonjusticiable political question. Id. at 1228-1229.[6] Plaintiffs timely filed a notice of appeal.
 
 II.
 
 14
 The threshold issue in this appeal is one of standing. Defendants assert that none of the plaintiffs have standing to litigate the issues raised in the complaint. Because the position of each of the plaintiffs is the same and because we conclude that the Shipyard employees and their union have standing, we need not address the standing of the remaining plaintiffs. See, e.g., City of Los Angeles v. National Highway Traffic Safety Admin., 912 F.2d 478, 485 (D.C.Cir.1990).
 
 
 15
 A person who seeks standing to challenge agency action must show (1) injury in fact and (2) that his interests are arguably within the zone of interests intended to be protected by the statute or constitutional provisions on which the claim is based. Association of Data Processing Service Orgs., Inc. v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). A showing of injury in fact is required by the constitutional limitation of federal court jurisdiction to actual cases or controversies. Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976). The injury must be concrete and one which can be addressed by the court should the plaintiff prevail on the merits. Id. at 37-38, 96 S.Ct. at 1923-24. This test is intended to ensure that complainants have a "personal stake" in the outcome of the proceedings. Id.
 
 
 16
 There can be no doubt that Shipyard employees have a personal stake in these proceedings. If the shipyard is closed, their jobs will be lost. If they prevail on their claim, it is within the power of the district court to grant effective relief. Thus, the Shipyard employees meet the injury in fact requirement.
 
 
 17
 To satisfy the zone of interests requirement, a plaintiff must "establish that the injury he complains of (his aggrievement, or the adverse effect upon him ) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (emphasis in original). As explained by the Supreme Court,
 
 
 18
 The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.
 
 
 19
 Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399-400, 107 S.Ct. 750, 757-758, 93 L.Ed.2d 757 (1987) (footnote omitted). We must thus inquire whether employees of military bases were within the zone of interests meant to be protected by the Act. See Air Courier Conference of Am. v. American Postal Workers Union, 498 U.S. ----, 111 S.Ct. 913, 918, 112 L.Ed.2d 1125 (1991).
 
 
 20
 The legislative history of the Act demonstrates Congress' sensitivity to the impact of a base closing on the employees of the base and the community in which they live. Because of this sensitivity, Congress sought to ensure that the interest of the employees and their communities would be heard and that the process would be perceived by them as fair. To further this objective, Congress provided for opportunities for public hearings and comment. See, e.g., §§ 2903(d)(1) and 2903(b). It also provided that, if the national interest is found to outweigh those of the local community, economic assistance would be provided to assist in the period of transition. § 2905(a)(1)(B). Finally, because of this congressional concern reflected in the Act and its legislative history, the base closing criteria established by the Secretary of Defense and left unaltered by the Congress include among the eight factors to be considered "the economic impact on communities." 56 Fed.Reg. 6374 (Feb. 15, 1991).
 
 
 21
 Given Congress' concern and the steps it took to assure consideration of the interests of employees and their communities, we readily conclude that individual Shipyard employees are within the zone of interest sought to be protected by the Act and that they have standing to press the issues raised in the complaint. We reach a similar conclusion with respect to the unions who are seeking to represent the interests of the members. International Union, UAW v. Brock, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).
 
 III.
 
 22
 Section 702 of the Administrative Procedure Act ("APA") provides that any "person ... aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof." 5 U.S.C. § 702. The APA stipulates that the reviewing court will "set aside agency action ... found to be ... arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; ... contrary to constitutional right ...; [or] without observance of the procedure required by law." 5 U.S.C. § 706(2). Review under the APA is available, however, only "to the extent that ... statutes [do not] preclude judicial review" and the "agency action is [not] committed to agency discretion by law." 5 U.S.C. § 701(a).
 
 
 23
 The defendants insist that the district court had no authority under the APA to conduct a review of the decision to close the Shipyard because the Act precludes judicial review. Litigants making such a contention have a very substantial burden to shoulder. As the Supreme Court stated in Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670-71, 106 S.Ct. 2133, 2135-36, 90 L.Ed.2d 623 (1986) (emphasis added):
 
 
 24
 We begin with the strong presumption that Congress intends judicial review of administrative action. From the beginning "our cases [have established] that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." [citations omitted]. In Marbury v. Madison, 1 Cranch 136, 137 , 5 U.S. 137, 163, 2 L.Ed. 60 (1803), a case itself involving review of executive action, Chief Justice Marshall insisted that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws."
 
 
 25
 * * * * * *
 
 
 26
 Committees of both Houses of Congress have endorsed this view. In undertaking the comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers that culminated in the passage of the [APA], the Senate Committee on the Judiciary remarked:
 
 
 27
 "Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board." S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).
 
 
 28
 Because "the very essence of civil liberty" is implicated, courts will presume the availability of judicial review unless there is "clear and convincing evidence of a contrary legislative intent." Bowen, 476 U.S. at 671, 106 S.Ct. at 2136, quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). This "clear and convincing" standard is not meant in the strict evidentiary sense, but rather as "a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." Block v. Community Nutrition Inst., 467 U.S. 340, 351, 104 S.Ct. 2450, 3456, 3457, 81 L.Ed.2d 270 (1984).
 
 
 29
 The second category of agency action not subject to judicial review under the APA is that which is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is, in essence, a subset of those cases where the statute passed by Congress precludes judicial review. That is, Congress in some instances evidences an intent that there be no judicial review by requiring an agency or official to make a decision in circumstances under which a reviewing court either would have no law to apply or would find itself confronted with judicially unmanageable issues. Because decisions "committed to agency discretion" are but one example of decisions with respect to which Congress has precluded judicial review, the strong presumption favoring such review applies here as well, and review is available unless it is clear that a reviewing court could not conduct a meaningful review. See Davis Enter. v. United States Envtl. Protection Agency, 877 F.2d 1181, 1185 (3d Cir.1989) (presumption of reviewability exists in cases interpreting § 701(a)(2) of APA), cert. denied, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).
 
 
 30
 The availability of judicial review under the APA is thus a matter of congressional intent[7] and we must address the reviewability of each of the issues raised by plaintiffs with that fact in mind. Before turning to that task, however, there is one further preliminary matter to be noted. The actions challenged here are not "agency actions" as usually encountered under the APA. The decisionmaking contemplated by the Act is a joint undertaking. The President, exercising the authority which he here exercised, could not close a base that the Commission had not recommended for closure. On the other hand, the Secretary and the Commission can only make recommendations under the Act. If the President fails to approve the Commission's recommendations, the closure process comes to an end for that year. § 2903(e)(5). While the statutory and constitutional violations alleged here result from actions or omissions of the Commissioner and the Secretary of Defense prior to the making of their recommendations, the alleged injury to the plaintiffs did not occur but for a decision of the President and it is from that decision that the plaintiffs necessarily seek relief; it is the implementation of the President's decision that we have been asked to enjoin. Thus, at least in one sense, we are here asked to review a presidential decision.
 
 
 31
 While the issue remains an open one in this Circuit, the APA may not be applicable to presidential decisionmaking. The Court of Appeals for the District of Columbia Circuit held in Armstrong v. Bush, 924 F.2d 282 (D.C.Cir.1991) that the APA does not apply to the President. In Armstrong, the court reasoned that, while the APA defines "agency" as an "authority of the government", 5 U.S.C. § 701(b)(1), Congress adopted this broad language to avoid a formalistic definition of the term and did not intend to subject the President to the APA's requirements. 924 F.2d at 289. The court also noted the longstanding practice of not requiring the President to abide by APA rulemaking procedures when issuing executive orders, and the rule that when Congress sets out to restrict presidential action, it must make its intentions clear. Id.
 
 
 32
 Even if the APA does not apply to decisions of the President, however, its provisions concerning judicial review represent a codification of the common law, 5 Kenneth C. Davis, Administrative Law § 28:4 (1984), cited with approval in Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985); see also ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 282, 107 S.Ct. 2360, 2367, 96 L.Ed.2d 222 (1987) (APA "codifies the nature and attributes of judicial review"), and actions of the President have never been considered immune from judicial review solely because they were taken by the President. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); see also INS v. Chadha, 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983) ("[e]xecutive action under legislatively delegated authority ... is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review"); Nixon v. Fitzgerald, 457 U.S. 731, 781, 102 S.Ct. 2690, 2717, 73 L.Ed.2d 349 (1982) (White, J., dissenting) ("it is the rule, not the exception, that executive actions--including those taken at the immediate direction of the President--are subject to judicial review"). As explained hereafter, we view the decisionmaking assigned to the President by the Act as clearly committed to his discretion and unreviewable. Congress's intent in this regard is sufficiently clear that our review would be the same whether or not the presumption favoring judicial review under the APA is applicable to presidential decisionmaking. It follows that our conclusions with respect to the availability of judicial review in this case will be the same whether or not the APA applies to presidential decisionmaking.
 
 A.
 
 33
 We think it can be said with confidence that Congress intended no judicial review of decisions under the Act prior to the effective date of the President's decision, i.e., the first date upon which the Secretary can carry out any closure or realignment under § 2904(b). We say this for two reasons. First, the statutory scheme is inconsistent with there being judicial review prior to this point. The Act sets a very stringent timetable for the various stages of the process it establishes and Congress clearly intended that the final decision on base closing and realignment be reached with alacrity. The Secretary is required to submit his list of recommendations to the Commission by April 15th. § 2903(c). The Commission is then required to submit its final report to the President by July 1st, ten weeks later. § 2903(d). The President, in turn, is required to make his decision within two weeks, by July 15, 1991. § 2903(e). Finally, the Act allows Congress 45 days in which to disapprove the President's decision. § 2904(b). As the Supreme Court has repeatedly noted, judicial review while an administrative process is on-going is disruptive even where there is no requirement of expedition. See, e.g., Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975) (premature judicial interference with agency processes may prevent agency from functioning efficiently). With a timetable like that established in the Act, the ability of the participants to meet their responsibilities would be seriously jeopardized if litigation were permitted to divert their attention. Second, Congress was undoubtedly aware of the rule that the courts may review agency action only if its impact upon plaintiffs is direct and immediate, see Abbott Labs., 387 U.S. at 152, 87 S.Ct. at 1517. One can rarely if ever be injured by a base closing prior to a decision having been made to close that base. The actions of the Secretary and the Commission prior to the President's decision are merely preliminary in nature. See State of Nevada v. Watkins, 939 F.2d 710, 715 (9th Cir.1991) (holding that Congress intended to preclude judicial review of "preliminary decisionmaking activity").
 
 B.
 
 34
 One can also say with confidence that Congress intended no judicial review of the manner in which the President has exercised his discretion in selecting bases for closure; indeed, plaintiffs do not argue otherwise. Congress imposed no restrictions on the discretion of the Commander-in-Chief concerning the domestic deployment of the nation's military resources. The Act does not require of the President, as it does of the Secretary and Commission, that he accept the force structure plan and the base-closing criteria. See § 2903(e). If the President believes that the assessment of military need by the Secretary is understated or overstated, he can reject the recommendations for that reason. This leaves a court with no law to apply; i.e., the decision on which bases to close is committed by law to presidential discretion, and judicial review cannot be available. Cf. Chicago and Southern Air Lines v. Waterman S.S. Co., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (under federal statute, applications to engage in foreign air transportation must be approved by President after recommendation by Civil Aeronautics Board; before Presidential approval, no appealable final result exists, and Presidential decision itself is not reviewable because it is committed to his discretion).
 
 C.
 
 35
 This does not end the matter, however. As this court has repeatedly stressed, judicial review is foreclosed only "to the extent that statutes preclude" such review and only "to the extent that agency action is committed to agency discretion by law." 5 U.S.C. § 701(a); see, e.g., Kirby v. United States Govt. Dep't of Hous. and Urban Dev., 675 F.2d 60 (3d Cir.1982); Local 2855, AFGE v. United States, 602 F.2d 574 (3d Cir.1979). Thus, the fact that some aspects of a decisionmaking process are determined to be not subject to judicial review does not absolve the courts from the responsibility of determining whether a clear congressional intention to preclude review exists with respect to other aspects of that same process. There are a number of statutes, for example, in which Congress has clearly intended that there be no review of the ultimate exercise of the agency's discretion, but, at the same time, has anticipated judicial review of compliance with its procedural mandates concerning the process leading up to the ultimate discretionary decision. See, e.g., Bowen, 476 U.S. at 675-76, 106 S.Ct. at 2138-39 (Medicare statute explicitly limits review of benefit determinations, but challenges to method of determination are not so limited and therefore are reviewable); Kirby, 675 F.2d at 67-68 (under Housing Act of 1959, decision by Secretary of HUD to provide funding for housing project is unreviewable, but agency's compliance with procedures in Act is subject to review). Accordingly, we must conduct an issue-specific analysis with congressional intent as our loadstar.
 
 
 36
 In this context, it is important to note that while Congress did not intend courts to second-guess the Commander-in-Chief, it did intend to establish exclusive means for closure of domestic bases. § 2909(a). With two exceptions,[8] Congress intended that domestic bases be closed only pursuant to an exercise of presidential discretion informed by recommendations of the nation's military establishment and an independent commission based on a common and disclosed (1) appraisal of military need, (2) set of criteria for closing, and (3) data base. Congress did not simply delegate this kind of decision to the President and leave to his judgment what advice and data he would solicit. Rather, it established a specific procedure that would ensure balanced and informed advice to be considered by the President and by Congress before the executive and legislative judgments were made. We must keep this congressional objective in mind as we inquire whether and to what extent Congress intended decisions of the Secretary and Commission to be reviewable when someone aggrieved by a base closing alleges that those decisions and the process underlying them deviated from this congressional model.
 
 D.
 
 37
 The defendants' primary argument is that Congress intended to preclude all judicial review of the base closure process other than the limited and here irrelevant review[9] expressly authorized by the Act. The defendants acknowledge that there is no express prohibition of judicial review under the Act. They correctly point out, however, that this does not end the inquiry. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block, 467 U.S. at 345, 104 S.Ct. at 2454. Defendants contend that the purpose of the Act, its structure and its legislative history are inconsistent with the existence of any judicial review other than in the narrow area expressly authorized. We disagree. While the defendants have pointed to plausible reasons why Congress might have decided to dispense with all judicial review not expressly authorized, nothing in the statute or its legislative history provides a basis for concluding with confidence that it actually decided to do so.
 
 
 38
 As we shall see, there are some areas of decisionmaking under the Act in which Congress did not intend the courts to engage in second-guessing. Whether one classifies those areas as "committed to agency discretion" or simply as areas in which Congress intended to preclude judicial review makes no difference; either way one looks at it, the character and context of the decision required by the Act reflects a clear legislative intention that there be no judicial review. On the other hand, there are other areas where our analysis leaves us with only the strong presumption favoring judicial review and no clear and convincing rebuttal. To hypothesize the paradigm case, if the Commission decided to dispense with public hearings in the interest of expedition, we could point to no clear and convincing evidence that Congress meant either to commit that decision to the Commission's discretion or otherwise to preclude judicial review of it.
 
 
 39
 Defendants purport to find a host of clear and convincing evidence of review preclusion in the Act and its legislative history. We will comment only on their three most plausible arguments: those pertaining to the timetable established by the Act, its express provision for limited NEPA review, and the cryptic legislative history concerning judicial review.
 
 
 40
 As we have noted, we agree with the proposition that the Act's timetable is inconsistent with judicial review prior to the final decision on which bases to close. However, we see little tension between that timetable and judicial review after a final list of bases for closure or realignment has been established. Judicial review at this stage will not interfere with the decisionmaking progress and holds no more potential for delay in implementing the final decision than exists in most of the broad range of situations in which Congress has countenanced judicial review. Moreover, the process for carrying out decisions to close and realign bases is complicated and time-consuming, see § 2905 (governing implementation of the approved list); bases are not closed or realigned overnight. The process of judicial review has proved sufficiently flexible to accommodate governmental actions involving far greater exigency. Finally, we know from the legislative history that Congress was very sensitive to the impact that base closing and realignments have on the livelihood and security of millions of Americans and to the importance of public confidence in the integrity of the decisionmaking process. See H.R.Rep. No. 665, 101st Cong., 2d Sess. 385 (1990), reprinted in 1990 U.S.C.C.A.N. 2931, 3078. In this context, accepting the brief delay occasioned by judicial review seems to us entirely consistent with the statutory scheme.
 
 
 41
 Defendants also contend that congressional intent to preclude judicial review, in particular review of procedural compliance with the Act, can be inferred from the Act's limitation of NEPA review. § 2905. Defendants point out that NEPA claims have been used to delay earlier base closures; they conclude that Congress expressed its intent to prevent procedural challenges in general by specifically excluding most of the new base closure process from compliance with NEPA. Plaintiffs look at the same facts and come to the opposite conclusion: By explicitly precluding only one kind of judicial review (NEPA), Congress intended all other kinds of review to be available. That two utterly inconsistent, yet plausible arguments may be fashioned from the same legislative expression is an example of why the Supreme Court has said, "[t]he existence of an express preclusion of judicial review in one section of a statute is a factor relevant to congressional intent, but it is not conclusive with respect to reviewability under other sections of the statute." Morris v. Gressette, 432 U.S. 491, 506 n. 22, 97 S.Ct. 2411, 2421 n. 22, 53 L.Ed.2d 506 (1977). In short, we conclude that § 2905(c) does not constitute clear evidence of congressional intent with respect to all judicial review under the Act.[10]
 
 
 42
 Finally, the defendants argue that an intent to preclude judicial review is discernable from the legislative history of the Act. In particular, they point to a paragraph in the House Conference Report which addresses the question of judicial review:
 
 
 43
 The rulemaking (5 U.S.C. 553) and adjudication (5 U.S.C. 554) provisions of the Administrative Procedures Act (5 U.S.C. 551 et seq.) contain explicit exemptions for "the conduct of military or foreign affairs functions." An action falling within this exception, as the decision to close and realign bases surely does, is immune from the provisions of the [APA] dealing with hearings (5 U.S.C. 556) and final agency decisions (5 U.S.C. 557). Due to the military affairs exception to the [APA], no final agency action occurs in the case of various actions required under the base closure process contained in this bill. These actions, therefore, would not be subject to the rulemaking and adjudication requirements and would not be subject to judicial review. Specific actions which would not be subject to judicial review include the issuance of a force structure plan under section 2903(a), the issuance of selection criteria under section 2803(b), [sic.] the Secretary of Defense's recommendation of closures and realignments of military installations under section 2803(d), [sic.] the decision of the President under section 2803(e), [sic.] and the Secretary's actions to carry out the recommendations of the Commission under sections 2904 and 2905.
 
 
 44
 House Conference Report at 706, 1990 U.S.C.C.A.N. at 3258. The district court concluded that "[t]his passage ... expresses a clear congressional intent to preclude judicial review under the APA of all actions taken pursuant to the Base Closure Act." Specter, at 1228. We disagree.
 
 
 45
 This passage is at best ambiguous. A fair reading reveals only an intent to preclude judicial review to the extent that there is not yet "final agency action" to review.[11] On its face, this paragraph does not claim that the Act itself forecloses any judicial review. Its only assertion is that the APA will preclude some judicial review and the only rationale given for the limited preclusions it contemplates under the APA is the absence of finality. The first three "specific actions" in the following list of illustrative actions that "would not be subject to judicial review" each lack finality and thus fit comfortably with the reading we find most plausible. The reference to the last two unreviewable "specific actions," the President's action on the Commission's recommendation and the Secretary's action in carrying out the ultimate decisions, concededly do not fit as well. At some point both of these types of actions become final. Nevertheless, to the extent the inclusion of reference to these actions is significant at all,[12] they do not provide us with clear evidence that Congress intended to preclude all judicial review not expressly authorized. If Congress anticipated that these particular actions would not be reviewable, it is far more reasonable to attribute this to the fact that both types of actions are clearly committed by the Act to the discretion of the decisionmaker.
 
 
 46
 Because we find no clear evidence of a congressional intent to preclude all judicial review other than the limited NEPA review, we reject defendants' primary argument.
 
 
 47
 We recognize that our conclusion that judicial review is not altogether precluded means that there may be cases in which the challenged agency action will be found to fall short of or be inconsistent with the standards of the Act. We hasten to add that such a finding, if and when made, will not necessarily mandate judicial relief. Whether or not a violation receives a remedy is something that a court must determine through an exercise of discretion based on the character of the violation and all of the surrounding circumstances.[13] Thus, judicial review does not mean that any technical defalcation will invalidate the package and require that the process be repeated from square one.
 
 E.
 
 48
 Having rejected the thesis that all judicial review is precluded, we now turn to the specific agency actions challenged by the plaintiffs and attempt to determine with respect to each allegation whether or not there is clear and convincing evidence of a congressional intent that there be no judicial review. Count I, it will be recalled, focuses on alleged deficiencies in the performances of the Secretaries of Navy and Defense.
 
 
 49
 The Secretary of Defense is required by the Act (a) to develop a force structure plan forecasting military need, (b) to identify criteria to be applied in determining which bases should and should not remain to meet that need, and (c) to formulate specific recommendations by applying that plan and those criteria to the current deployment of military resources throughout the country. § 2903(a)-(c). The Act makes no reference to the Secretary of the Navy and places no restrictions on the Secretary of Defense with respect to his sources of data or advice.
 
 
 50
 The plaintiffs challenge the decisionmaking process of the Secretary of Defense in fulfilling the above assignments. They allege, inter alia, that his force structure plan "lacked sufficient detail"; that his specific recommendations were based on inadequate data; and that he had "decided" to close the Shipyard before developing the criteria and manipulated the criteria so as to justify that result, in violation of § 2903(c)(3) (requiring Secretary to consider all domestic installations "equally without regard to whether [they had] previously been considered for closure"). In addition, plaintiffs allege that the Secretary of Defense relied on advice and data from the Secretary of the Navy that was inadequate, insufficiently explained, and inadequately documented.
 
 
 51
 We do not think Congress intended for the courts to review this kind of challenge to action under the Act. We say this primarily for two reasons. First, the Secretary's recommendations are clearly committed to his discretion under the Act. While those recommendations are required to be based on the force structure plan and the base closing criteria and thus, in one sense, there are standards to be applied, the Secretary was assigned the task of formulating those standards because that task required military and other expertise.[14] So, too, do the tasks of applying those standards to the circumstances of each installation and of establishing priorities among them. Review of the Secretary's performance of these tasks would necessarily present issues that simply are not "judicially manageable." In comparable circumstances, courts have concluded, based on the unmanageable nature of the issues that would be presented, that Congress anticipated no judicial review. See Heckler, 470 U.S. at 830, 105 S.Ct. at 1655 ("if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.' ").
 
 
 52
 In National Federation of Federal Employees v. United States, 905 F.2d 400, 405-406 (D.C.Cir.1990) ("NFFE "), the Court of Appeals for the District of Columbia was asked to review the decisions of the Commission and the Secretary to close domestic military bases under the 1988 Base Closure Act, the predecessor of the 1990 Act which involved no presidential action. The court concluded that Congress intended no judicial review and we find ourselves in agreement with its reasoning:
 
 
 53
 [T]he problem is not that the Act is devoid of criteria; ... [the Act] sets forth nine specific criteria to be considered in making base closing decisions. Rather the rub is that the subject matter of those criteria is not "judicially manageable." ... [J]udicial review of the decisions of the Secretary and the Commission would necessarily involve second-guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure. We think the federal judiciary is ill-equipped to conduct reviews of the nation's military policy. Such decisions are better left to those more expert in issues of defense.
 
 
 54
 The second, related ground for our conclusion that Congress contemplated no judicial review of these kinds of decisions, is Congress' provision of alternative methods of review. Congress anticipated that questions would be raised about the adequacy of the Secretary's data and analysis. It decided to put these questions to rest and guarantee the integrity of the process not through judicial review, but through review by two bodies far more suited to the task: the Commission, and the GAO. These two entities are charged with the assessment of the Secretary's application of the criteria and the force structure plan. Given the nature of this task, it seems clear to us that an additional review by the courts would not contribute to public confidence in this part of the process and accordingly, we doubt that Congress intended an additional level of review.
 
 
 55
 One further comment is in order in connection with this category of issues. Plaintiffs argue that it takes no military expertise to make a finding of historic fact as to whether the Secretary prejudged the relevant issue by deciding to close the Shipyard prior to establishing the criteria. We conclude that this is an oversimplification. When Congress called upon the Secretary to make recommendations, it was, of course, aware that he necessarily had given prior thought to the subject of base closures. It thus could not have considered prior thinking on the subject or even prior tentative decisionmaking to be a disqualifying fact. Surely, Congress intended nothing more of the Secretary than that he give meaningful, fresh consideration with respect to any issues previously visited. This is significant because judicial review of whether the Secretary has taken a meaningful fresh look necessarily presents the same kind of judicially unmanageable issues as a review to determine the adequacy of the data utilized by the Secretary.
 
 
 56
 The Act also provides that the "Secretary shall make available to the Commission and the Comptroller General of the United States all information used by the Department in making its recommendations to the Commission for closures." § 2903(c)(4). The Act thus appears to contemplate that the Commission and the GAO will have access to the Secretary's data base so that they can evaluate his recommendations. The plaintiffs, we think, charge that the Secretary failed to create and transmit to the Commission and the GAO an administrative record containing all of the information the Secretary relied upon in making his recommendations. If this is what the plaintiffs claim, we conclude that their claim is judicially reviewable. Judicial review of that claim presents the kind of issues with which courts have traditionally dealt and we perceive no other evidence of a congressional intent to preclude judicial review of that claim. Indeed, such a review seems entirely consistent with Congress' desire to assure the integrity of the decisionmaking processes. Accordingly, the presumption favoring judicial review must prevail with respect to this category of issues.
 
 
 57
 We admit to some confusion, however, as to whether the plaintiffs are complaining about the failure to transmit the data, or the adequacy of the data to support the recommendations. Based on the foregoing analysis, the former is reviewable by a court, the latter is not. Similar ambiguity can be found in several other of the claims here. For example, plaintiffs charge the Secretary with having failed to publish in the Federal Register as required by the Act "a summary of the selection process" and "a justification for each recommendation." Complaint at 48. If the point here is that there was no publication and the Act required it, this is clearly a reviewable claim. If the point is that the Act requires individual justification and there were none, this again is reviewable. On the other hand, if the point is that the justifications were unpersuasive or inadequately detailed, this is not a judicially reviewable allegation.
 
 F.
 
 58
 Turning to Count II, the Act requires the Commission to apply the force structure plan and criteria to the current deployment of military forces and make an independent judgment about the Secretary's recommendations. The plaintiffs challenge the decisionmaking process by which the Commission fulfilled this assignment. They charge, for example, that the Commission failed to consider all of the Navy installations equally without regard to previous consideration for closure, that it failed to insist on adequate help from the GAO, that it accepted the recommendation of the Secretary with respect to the Shipyard even though the GAO had concluded that the Navy's decisionmaking was inadequately documented, that it (the Commission) utilized unpublished criteria, and that it failed to apply the published criteria equally to all installations.
 
 
 59
 We conclude that each of these challenges go to the merits of the recommendations of the Commission and that the merits of those recommendations, like the merits of the recommendations of the Secretary, are not subject to second guessing by the judiciary. We are again in agreement with the court in NFFE that the issues raised by a review of the Commission's recommendations are not judicially manageable ones. We note as well that under the Act the President and Congress review the Commission's recommendations, and both are better suited to the task than are the courts.
 
 
 60
 The Act does, however, require the Commission to hold public hearings, § 2903(d)(1), and the plaintiffs contend that the Commission failed to do so. Here again we are not certain we understand plaintiffs' argument, but if it is that the Act requires the Commission to base its decision solely on the Secretary's administrative record and the transcript of the public hearings, and that the Commission went beyond this record by holding closed-door meetings with the Navy, we believe their contention is judicially reviewable. In so holding, we do not decide that the Act does so require or that a remedy is available under the circumstances of this case even if it does.[15]
 
 
 61
 In sum, we conclude that the presumption favoring judicial review is rebutted with respect to a majority of plaintiffs' claims by the fact that the issues presented in such a review would be judicially unmanageable. Where the plaintiffs ask the court to substitute its political and military judgment for that of the Secretary and the Commission, their claims are not reviewable. The plaintiffs do, however, ask for judicial review of issues that the judiciary is entirely competent to address. With respect to those issues we find the presumption in favor of judicial review unrebutted by the other alleged indicia of congressional intent. While our analysis leaves the district court with a line drawing task, it should provide the guidance necessary for disposition of plaintiffs' numerous challenges.
 
 IV.
 
 62
 As an alternative ground for its decision, the district court held that the political question doctrine prevented it from reviewing the actions of the Secretary and the Commission. Noting that the Act is a carefully wrought compromise which provides both the President and Congress with an opportunity to reject the Commission's recommendations, the court reasoned that this case is "one which [is] impossible for the court to resolve independently without expressing a lack of respect due the coordinate branches of government." Specter, at 1229, alluding to language in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
 
 
 63
 The Court in Baker described the elements that identify a nonjusticiable political question:
 
 
 64
 Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 65
 369 U.S. at 217, 82 S.Ct. at 710.[16] More recently, in Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986), the Court explained that "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." The Court also emphasized, however, that "one of the Judiciary's characteristic roles is to interpret statutes" and determine the obligations of the Executive under relevant statutes, and "we cannot shirk this responsibility merely because our decision may have significant political overtones." Id.
 
 
 66
 The authorities cited above clearly demonstrate that, while it is not the role of the courts to disturb policy decisions of the political branches, the question of whether an agency has acted in accordance with a statute is appropriate for judicial review. In particular, we do not read those authorities as precluding judicial review of any of the kinds of issues we have previously identified as judicially reversible. If, for example, the statute requires that a decision of the Commission be based solely on the record transmitted by the Secretary and that produced during the public hearing, the political question doctrine, we conclude, would not bar review.
 
 
 67
 Defendants defend the district court's decision by pointing out that whichever of plaintiffs' claims one addresses, "the relief sought by [them] interferes directly with the policy decision to close the Shipyard and other installations." Brief for Appellees at 37. The fact that judicial review might undermine the Commission's policy choices, however, cannot by itself mean that review is not available. Judicial review of agency action almost always holds the potential to disrupt the agency's policy decisions. Japan Whaling, for example, involved a challenge to a decision by the Secretary of Commerce not to certify Japan under the Fishery Conservation and Management Act as acting to the detriment of an international whaling agreement. This certification, if made, would have forced the Secretary to repudiate an existing executive agreement with Japan allowing for a more gradual decrease in that country's commercial whaling. The Court, "cognizant of the interplay between [the statute] and the conduct of this Nation's foreign relations," nevertheless held the case to present a justiciable question of determining whether the Secretary had met his duty under the statute, "a recurring and acceptable task for the federal courts." 478 U.S. at 230, 106 S.Ct. at 2866.
 
 
 68
 Defendants also argue that "the lack of respect that gives rise to a political question is especially pronounced in this case because the Act assigns Congress, rather than the courts, the role of passing judgment on the base closure decision of the Executive branch." Brief for Appellees at 38. While we agree that the Act assigns this role to Congress and that this assignment is highly relevant to some of the judicial review issues posed by this case, we cannot agree that Congress's role under the Act precludes all judicial review. If congressional oversight were alone enough to create a nonjusticiable political question, the doctrine would grow to unmanageable dimensions: Congress "exercises oversight over all agencies, gets reports from many, and is often consulted by the executive branch before specific actions are taken." Armstrong, 924 F.2d at 292 (quotation omitted) (congressional oversight over agency action does not necessarily indicate intent to preclude judicial review).
 
 
 69
 Finally, defendants argue that there is "a textually demonstrable constitutional commitment" of the base closing issue "to a coordinate political department." Baker, 369 U.S. at 217, 82 S.Ct. at 710. That is, decisions concerning military affairs are committed to the political branches under Articles I and II of the Constitution, and the ultimate issue here is the physical disposition of the nation's military forces. Brief for Appellees at 39-40. As plaintiffs point out, however, the fact that one facet of a decisionmaking process involves an exercise of discretion concerning military affairs does not insulate all aspects of that process from judicial review. Friends of the Earth v. U.S. Navy, 841 F.2d 927 (9th Cir.1988) (federal environmental statutes require Navy to obtain state permit before constructing port; Navy enjoined from construction until permit issued). The authorities cited by defendants are not to the contrary; in these cases, the courts were asked to involve themselves in matters well beyond judicial competence. See Luftig v. McNamara, 373 F.2d 664 (D.C.Cir.1967) (private in U.S. Army sought to have Vietnam War declared illegal and unconstitutional), cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967); Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (in wake of shootings at Kent State, students sought judicial review and continuing surveillance over training, weaponry, and orders of National Guard).
 
 V.
 
 70
 In Count III of the complaint, the union and Shipyard employee plaintiffs allege that the defendants' disregard of the Act constitutes a violation of their rights under the Fifth Amendment Due Process Clause. They assert "that they possess a property interest under the ... Act in the Shipyard's continued operation unless and until it is determined, pursuant to a ... process in accordance with the mandates of the ... Act, that the Shipyard should be closed." Brief for Appellants at 40. In response, defendants argue that these plaintiffs have no cognizable "property interest" in the operation of the Shipyard.
 
 
 71
 It is well settled that protectable property interests can arise from a statutory scheme which creates legitimate claims of entitlement to particular benefits. Board of Regents v. Roth, 408 U.S. 564, 576-77, 92 S.Ct. 2701, 2708-09, 33 L.Ed.2d 548 (1972). Even where an intent to bestow a benefit on private individuals is clear, however, a statutory requirement that certain procedures be observed before a benefit can be withdrawn does not in itself create a protected property interest. Olim v. Wakinekona, 461 U.S. 238, 249-51, 103 S.Ct. 1741, 1747-48, 75 L.Ed.2d 813 (1983); Stephany v. Wagner, 835 F.2d 497, 500 (3d Cir.1987), cert. denied, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988); see also, Hill v. Group Three Housing Dev. Corp., 799 F.2d 385, 391 (8th Cir.1986) (intent to benefit plaintiff not enough to create cognizable property interest). The mere fact that the Shipyard cannot be closed without meeting the requirements of the Act does not mean that Shipyard employees have a valid due process claim when those procedures are not observed. Rather, the dispositive question in deciding whether the statute creates a protectable property interest is whether it places substantive limits on official discretion for the benefit of shipyard workers. Stephany, 835 F.2d at 500, quoting Olim, 461 U.S. at 249, 103 S.Ct. at 1747. The statute must contain "explicitly mandatory language, i.e. specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow," in order to create a property interest. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989). Put another way, the complainant "must show that particularized standards or criteria guide the [government's] decisionmakers" in order to claim protection under the due process clause. Olim, 461 U.S. at 249, 103 S.Ct. at 1747 (quotation omitted).
 
 
 72
 While the Act establishes a specific process for closing military installations, it places no substantive limits on any of the decisionmakers. The Secretary is allowed to develop and publish criteria and a force structure plan, without specific guidance from the statute, and has broad discretion in applying those standards to current domestic deployment of military resources. The Commission also is accorded broad discretion in applying those standards and may accept the Secretary's recommendations even if they deviate substantially from the final criteria and force structure plan. See § 2903(d)(2)(B). Finally, the President and Congress, of course, may reject the Commission's recommendations for any reason at all. See §§ 2903(e), 2904(b).
 
 
 73
 In sum, the Act specifies a particular process but does not guarantee a particular outcome. As a result, the unions and the Shipyard employees can identify no legitimate claim of entitlement under the Act and Count III fails to state a due process claim upon which relief could be granted.
 
 VI.
 
 74
 The judgment of the district court is reversed and this case is remanded to that court for further proceedings consistent with this opinion.
 
 
 75
 ALITO, Circuit Judge, concurring in part and dissenting in part.
 
 
 76
 I join parts I, II, IV, and V of the opinion of the court, but I disagree with the court's decision insofar as it holds that some of the challenged administrative actions are subject to judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701 and 702.
 
 
 77
 As the court notes (maj. at 944), there is a "general presumption favoring judicial review of administrative action," but this presumption may be overcome by express statutory language, legislative history, or "inferences of intent drawn from the statutory scheme as a whole." Block v. Community Nutrition Inst., 467 U.S. 340, 349, 351, 104 S.Ct. 2450, 2456, 2457, 81 L.Ed.2d 270 (1984). Assuming that this presumption applies in the present context,[1] I conclude that the legislative history and the statutory scheme, considered together, show that Congress meant to preclude review.[2]
 
 I.
 
 78
 The legislative history must be viewed in light of the problems that Congress confronted when it enacted the Base Closure and Realignment Acts of 1988 and 1990. Congress undoubtedly recognized that objective and prompt decisions concerning base closings are vitally important, particularly at a time of budgetary problems and rapidly changing defense needs.[3] At the same time, Congress was acutely aware that for more than a decade before the passage of these laws, every attempt to close or realign a major base in this country had been blocked by Congress itself or by the courts.[4] The 1988 and 1990 Acts were devised to clear away the major obstacles that had produced this costly impasse.
 
 
 79
 One of the chief obstacles targeted by Congress was litigation that had obstructed base closing and realignment efforts. See H.R.Conf.Rep. No. 1071, 100th Cong., 2d Sess. 23 (1988) [hereinafter 1988 Conf. Rep.], reprinted in 1988 U.S.C.C.A.N. 3403. In 1977, Congress had enacted legislation requiring the Department of Defense to comply with various procedural requirements, including the preparation of an environmental impact statement under the National Environmental Policy Act of 1969 [hereinafter NEPA], before carrying out any major base closing or realignment. 10 U.S.C. § 2687(b)(1)-(3) (Supp.I 1977). In some instances, NEPA challenges had dragged on in the courts for years and had successfully blocked the closing of assertedly obsolete and unneeded bases. See 1988 Conf. Rep. at 23, 1988 U.S.C.C.A.N. at 3403. Both the 1988 and 1990 Acts dealt directly with this specific problem by generally prohibiting NEPA review.[5] While we are not concerned with NEPA review in this case, this experience is nevertheless instructive for present purposes. It demonstrates that Congress, anxious to remove the impediments that had effectively prevented base closings and realignments for more than a decade, was keenly aware how litigation concerning procedural requirements could be successfully used to stall and ultimately defeat base closing plans.
 
 
 80
 Unfortunately, while Congress expressly addressed the problem of NEPA review in the body of the 1988 and 1990 Acts, Congress did not confront the question of APA review in the same clear and direct manner. Instead, Congress relegated this question to discussion in the Conference Report. H.R.Conf.Rep. No. 923, 101st Cong., 2d Sess. 706 (1990) [hereinafter 1990 Conf. Rep.] reprinted in 1990 U.S.C.C.A.N. 3258. Moreover, the relevant passage in the Conference Report, which is set out in full in the court's opinion (maj. at 949), is not a model of clarity, as the majority points out (id.). The passage in the report jumbles together several separate administrative law concepts--the military affairs exception to the APA's general rulemaking and adjudication provisions (5 U.S.C. §§ 553(a)(1), 554(a)(4)), the concept of final agency action (5 U.S.C. § 704), and the availability of judicial review (5 U.S.C. §§ 701(a), 702). No party in this case has been able to provide a fully satisfactory exegesis of this passage--nor can I. Still, I do not think that this passage, particularly when viewed in light of the background recounted above, can be wholly dismissed. The passage does state quite clearly that there would be no APA review of key decisions in the base closing and realignment process, including the President's decision to accept the Commission's package of recommendations and the Secretary of Defense's actions in implementing that package after the 45-day report-and-wait period. Because the issuance of the Commission's package is not included in this list, I agree with the majority that this passage alone is not enough to overcome the strong presumption in favor of judicial review. Nevertheless, I believe that this passage, despite its ambiguities, provides support for the proposition that Congress did not want APA review to interfere with its detailed base closing and realignment scheme.[6]
 
 II.
 
 81
 "[T]he inferences of intent drawn from [this] scheme" (Block, 467 U.S. at 349, 104 S.Ct. at 2456) point clearly toward the same conclusion. This innovative scheme was designed to obviate the institutional impediments that were thought to have contributed to the decade-long impasse regarding base closings and realignments. Under this scheme, an independent, bipartisan Defense Base Closure and Realignment Commission was created to formulate a package of recommended closings and realignments. 1990 Act § 2902. After receiving submissions from the Department of Defense, the Commission must draw up and send its package of recommendations to the President by July 1 of the year in question. Id. § 2903(a)-(d). Within a short time--by July 15--the President must choose between two options: (a) he may approve the entire package and transmit it to Congress or (2) he may disapprove the package in whole or in part and send it back to the Commission for reconsideration. Id. § 2903(e). If the President selects the first option and approves the package, Congress may disapprove the entire package by joint resolution within 45 days. Id. § 2904(b). If Congress fails to do so, all of the slated closings and realignments may be carried out. Id.
 
 
 82
 If the President selects the second option and sends the package of recommendations back to the Commission, the Commission must issue a revised package by August 15. Id. § 2903(e)(3). The President may then approve or disapprove the entire revised package. Id. § 2903(e)(4). If he approves, the package is sent to Congress, and the procedure just described is followed. If he disapproves, the process ceases. Id. § 2903(e)(5).
 
 
 83
 This scheme was designed to eliminate at least three obstacles that had thwarted past efforts to close bases. First, the scheme sought to prevent delaying tactics by setting short, inflexible time limits for action by the Commission, the President, and the Congress. The legislative history makes it abundantly clear that speed and finality were regarded as indispensable components of the new scheme. The House Conference Report stated that one of the main defects in the prior procedures was that "closures and realignments [have taken] a considerable period of time and [have involved] numerous opportunities for challenges in court." 1990 Conf.Rep. at 705, 1990 U.S.C.C.A.N. 3257. The Report added that the new scheme was intended to expedite this process.[7] Representative Les Aspin, the chairman of the House Armed Services Committee and one of the sponsors of the 1988 Act,[8] reiterated the same point, stating that the new plan was intended to "streamline current law on base closures to allow for expeditious closure of bases once the decision to close had been fully reached under the process." 137 Cong. Rec. H6007 (daily ed. July 30, 1991). Representative Dick Armey, one of the architects of the new scheme,[9] stated on the House floor:
 
 
 84
 [O]ne huge advantage to this base closing procedure is that it allows a base closing decision to be made with some finality. In the past, proposed base closings were often disputed for year[s] before a final verdict was rendered. That was the worst of all possible worlds. Even if the base was eventually saved from closure, the businesses around the base were greatly harmed by the persistent uncertainty.
 
 
 85
 Under this procedure, however, all the communities affected [have] a chance to thoroughly make their case for their base. Now, this time of deliberation will come to an end and the decision will be made. At this point communities can roll up their sleeves, pull together, and find the best way to adjust to the base closure.
 
 
 86
 Id. at H6008.[10] On another occasion, Representative Armey wrote that "the supporters of obsolete bases ... by enacting an array of environmental study mandates, advance notice requirements, and gratuitous red tape ... have simply ground base closings to a halt."[11] He went on to explain that after a proposed closing is delayed for years by litigation "the local citizenry and members of Congress are thoroughly aroused, and the political pressures to cancel the closing order are all but insurmountable."[12] See also Base Closure Hearings at 19 (statement of Rep. Armey); 134 Cong.Rec. H1615 (daily ed. Apr. 13, 1988) (statement of Rep. Armey).
 
 
 87
 Second, the new scheme was designed to insulate base closing and realignment decisions from actual or apparent influence by partisan and other political considerations. In the past, Executive Branch recommendations had often been criticized and defeated on the ground that particular bases had been doomed or spared based on improper political factors. For example, Representative Armey said that prior base closing decisions had been "contaminated by unworthy political considerations" and that particular bases had been closed or retained in order to punish or reward members of Congress. 137 Cong.Rec. H6008 (daily ed. July 30, 1991).[13] Other members echoed these sentiments.[14] See also Commission Report at 1-1, 1-2.
 
 
 88
 The new scheme sought to remove any possible grounds for such charges by transferring the responsibility for recommending closings and realignments to an independent, nonpartisan body. Furthermore, the new scheme recognized that political considerations might creep back into the decisionmaking process if either the President or the Congress was permitted to add particular bases to or remove particular bases from the list formulated by the Commission. The new scheme therefore prohibited any such additions or deletions, restricting the President's and Congress's options to the acceptance or rejection of the Commission's entire list. The House Report on the 1990 Act explained that the "right way" to close bases is to use "a highly respected, bipartisan commission [to] recommend bases for realignment or closure based on a number of neutral and widely endorsed criteria" and to give Congress "the opportunity to accept or reject the recommendations as a whole." H.R.Rep. No. 655, 101st Cong., 2d Sess. 341, reprinted in 1990 U.S.C.C.A.N. 2931, 3067. Likewise, the House Report on the 1988 Act explained: "[A] major concern underlying the 'Base Closure Commission' proposal is that political pressures in the Congress could block the closing of particular facilities. One important element of the Committee's procedure that is designed to allay that concern is the provision that the resolution may not be amended by the Congress." 1988 House Report pt. II at 10, 1988 U.S.C.C.A.N. at 3372.
 
 
 89
 Third, the new scheme apparently reflected the belief that Congress, although previously unable to agree on any major base closings, would find it easier to approve a package of recommended closings that had to be accepted or rejected in its entirety. Chairman Aspin repeatedly emphasized this point in public statements,[15] and his predictions proved accurate. While no major closing or alignment had been accomplished since the 1970s, the Commission's 1991 recommendations were approved by the President, and a proposed joint resolution of disapproval lost in the House by an overwhelming margin. 137 Cong.Rec. H6006 (daily ed. July 30, 1991).
 
 III.
 
 90
 In my view, judicial review of base closing decisions is inconsistent with this scheme because a successful challenge--i.e., one that at least temporarily invalidates a base closing decision--would thwart the scheme's fundamental objectives.
 
 
 91
 First, it seems clear that judicial review would undermine the concepts of speed and finality that Congress regarded as vital parts of its plan. See Morris v. Gressette, 432 U.S. 491, 503-04, 97 S.Ct. 2411, 2419-20, 53 L.Ed.2d 506 (1977). In the vast majority of cases, judicial review could not be completed within the short time limits imposed by the Act. The majority acknowledges (maj. at 948) that "the Act's timetable is inconsistent with judicial review prior to the final decision on which bases to close," but the majority "sees little tension between that timetable and judicial review after a final list of bases for closure" has been approved by the President and not disapproved by the Congress.
 
 
 92
 I disagree. The new scheme crafted by Congress contemplates that a truly "final" decision on a package of closings and realignments would be completed within the short time periods set out.[16] The scheme did not contemplate that this "final" decision would then be subject to judicial review, possible reversal, and further action by the Commission, the President, and the Congress.
 
 
 93
 Furthermore, judicial review of one part of a purportedly "final" package will often implicate other parts of the package. Decisions regarding base closings sometimes involve hard choices concerning the relative merits of comparable bases. (In this case, for example, a major theme in the plaintiffs' complaint is the Philadelphia Naval Yard's claimed superiority over other similar naval yards that the Commission evaluated more highly and therefore recommended be retained.) Thus, if the Commission decides to recommend closure of base A rather than Base B and the decision on Base A is reversed after judicial review of the Commission's procedures, the decision to recommend retention of Base B will logically be called into question. In this way, judicial review of one part of the "final" package may reopen other parts of the package as well--or require the taxpayers to pay for clearly redundant facilities.
 
 
 94
 Not only would judicial review after a purportedly "final" decision upset the timetable set out in the Act, but such review would undermine the concept that neither the President nor Congress should be permitted to approve or disapprove the closing of a particular base but should instead be restricted to choosing between acceptance or rejection of the Commission's entire package. If the plaintiffs in this case succeed on their underlying APA claims and the Commission is required to conduct further proceedings and issue a new recommendation regarding the Philadelphia Naval Yard, the President and the Congress would then be placed in precisely the situation that the new scheme was designed to avoid--deciding whether to close or spare a single base.
 
 
 95
 In sum, it seems to me that the statutory scheme is grounded on concepts--speed, finality, and limiting the President and the Congress to an all-or-nothing choice on a package of recommendations--that are inconsistent with judicial review under the APA. Certainly I do not suggest that review of the decision regarding the Philadelphia Naval Yard will bring the statutory scheme tumbling down, and I am unable to predict what effect if any the precedent set by this case will have on litigation concerning future attempted closings. I conclude only that judicial review of base closing and realignment decisions is conceptually inconsistent with the innovative scheme enacted by Congress. This analysis, reinforced by the legislative history, leads me to the conclusion that base closing decisions are not reviewable under the APA.
 
 
 
 [1]
 See H.R. Conf.Rep. No. 1071, 100th Cong., 2d Sess. 23 (1988), reprinted in 1988 U.S.C.C.A.N. 3355, 3395, 3403 ("[t]he conferees recognize that [NEPA] has been used in some cases to delay and ultimately frustrate base closures, and support the narrowing of its applicability for closures and realignments under this act. However, they also believe that the NEPA goals of public disclosure and clear identification of potential adverse impacts ... should be protected")
 
 
 [2]
 In the interest of brevity, citations to the Act will hereinafter be limited to the section number only
 
 
 [3]
 Plaintiffs include United States Senators Arlen Specter and Harris Wofford of Pennsylvania, Bill Bradley and Frank R. Lautenberg of New Jersey; Governors Robert P. Casey of Pennsylvania, James J. Florio of New Jersey, and Michael N. Castle of Delaware; Attorneys General Ernest D. Preate, Jr. of Pennsylvania, and Robert J. Del Tufo of New Jersey; United States Representatives Robert E. Andrews, R. Lawrence Coughlin, Peter H. Kostmayer, and Robert A. Borski; the City of Philadelphia; the International Federation of Professional and Technical Engineers, Local 3, and its President Howard J. Landry; the Metal Trades Council, Local 687 Machinists, and its President William F. Reil; and the Planners Estimators Progressman & Schedulers Union, Local No. 2, and its President Ronald Warrington
 
 
 [4]
 Plaintiffs filed their original complaint before President Bush approved the Commission's recommendations. As we shall see, judicial review is not available at this preliminary stage; nevertheless, because the President made his decision while this suit was pending, we are not presented with a jurisdictional defect. "[I]n this Court, a 'premature appeal taken from an order which is not final but which is followed by an order that is final may be regarded as an appeal from the final order in the absence of a showing of prejudice to the other party.' Richerson v. Jones, 551 F.2d 918, 922 (3d Cir.1977) (emphasis in original)." Westinghouse Elec. Corp. v. United States Nuclear Regulatory Commission, 598 F.2d 759, 766 n. 22 (3d Cir.1979) (noting that court retained jurisdiction where appeal was filed subsequent to preliminary order of Nuclear Regulatory Commission, but before issuance of final NRC order). See also Dowling v. City of Philadelphia, 855 F.2d 136, 138 (3d Cir.1988) (distinguishing situation where notice of appeal is premature under FRAP 4(a)(4))
 
 
 [5]
 Defendants include the Secretary of the Navy, H. Lawrence Garrett, III; the Secretary of Defense, Richard Cheney; the Defense Base Closure and Realignment Commission and its members James A. Courter, William L. Ball, III, Howard H. Callaway, Duane H. Cassidy, Arthur Levitt, Jr., James C. Smith, II, and Robert D. Stuart, Jr
 
 
 [6]
 In addition to the two issues addressed by the district court, the appellees argued that none of the appellants had standing to bring the suit, and that the unions' due process claim failed to state a valid constitutional claim. The district court did not reach these issues
 
 
 [7]
 It is true, of course, that Congress may limit executive discretion only insofar as it acts within its constitutional grants of enumerated authority. See U.S. Const. art. I, § 8 (enumerating the chief powers granted to Congress). Neither party here, however, claims that Congress has acted beyond that authority in drafting the terms of the Act
 
 
 [8]
 The two other means by which bases may be closed are described in § 2909(c), which provides as follows, in relevant part:
 (c) Exception.--Nothing in this part affects the authority of the Secretary to carry out--
 (1) closures and realignments under title II of Public Law 100-526 [the 1988 Act]; and
 (2) closures and realignments ... carried out for reasons of national security or a military emergency ...
 
 
 [9]
 The Act does provide for limited review under NEPA, after the closure decisions have been made. See § 2905(c)(2). Specifically, NEPA applies to actions of the Secretary during the process of property disposal and during the process of relocating functions from one installation to another. To the extent it applies, NEPA requires any federal agency considering a "a major federal action significantly affecting the quality of the human environment" to prepare an Environmental Impact Statement identifying the environmental consequences of the proposed action and recommends ways to minimize those which are adverse. 42 U.S.C. § 4332(2)(C) (1988). Private parties may bring suit under the APA to challenge violations of NEPA's procedural requirements. See Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 491-92 (9th Cir.1987)
 
 
 [10]
 Although they did not do so, defendants might have argued that by allowing a very limited class of NEPA claims (§ 2905(c)(2) declares that NEPA "shall apply to actions of the Department of Defense ... during the process of property disposal, and ... during the process of relocating") but nowhere else allowing for judicial review, Congress expressed its intent to preclude all other forms of review. But we find this argument, too, ultimately unpersuasive. The mere failure to specify the availability of most forms of judicial review is not enough to overcome the strong presumption that this review may be had. See State of Illinois Dep't of Public Aid v. Schweiker, 707 F.2d 273, 277 (7th Cir.1983) ( [n]othing much can be inferred from the fact that Congress did not specify a method for judicial review ..., even though earlier [in the statute] it had specified such a method)
 
 
 [11]
 The reference in this passage to the APA's military affairs exception is especially mystifying. This exception to the general rulemaking and adjudication provisions in Chapter 5 of the APA, 5 U.S.C. §§ 553 and 554, gives agencies involved in military decisions discretion to determine how much public participation, if any, will be available before a final rule is issued, and what evidence will be heard (and by whom) during an agency hearing. The military affairs exception does not, however, determine whether a certain agency action is final within the meaning of Chapter 7 of the APA, 5 U.S.C. § 701 et seq., which governs judicial review
 
 
 [12]
 The inclusion of the Secretary's action under § 2905 as "not ... subject to judicial review" provides further support for the theory that this paragraph reflects little more than imprecise staff work. The Secretary's actions under § 2905 are the only actions under the Act that are expressly made subject to judicial review
 
 
 [13]
 Accordingly, it is unwise to speculate about the appropriate form of a remedy without knowing the character of and circumstances surrounding the violation. We do not agree, however, that affording judicial relief would necessarily frustrate Congress's intent to have presidential and congressional action only in the context of a "single package." As we shall see, any remedy afforded in this case would be limited to requiring further process in accordance with the provisions of the Act. Any such additional process could and should be afforded on an expedited basis. If the affording of that further process does not alter the recommendations of the Commission, reconsideration by the President or Congress might be unnecessary. If that further process would alter the Commission's recommendations, reconsideration of the entire list of recommendations by the President and Congress in accordance with the limited timetable of the Act might be both feasible and appropriate
 
 
 [14]
 The final criteria, for example, are reported in the Federal Register as follows:
 In selecting military installations for closure or realignment, the Department of Defense, giving priority consideration to military value (the first four criteria below), will consider:
 Military Value
 
 
 [1]
 The current and future mission requirements and the impact on operational readiness of the Department of Defense's total force
 
 
 [2]
 The availability and condition of land, facilities and associated airspace at both the existing and potential receiving locations
 
 
 [3]
 The ability to accommodate contingency, mobilization, and future total force requirements at both the existing and potential receiving locations
 
 
 [4]
 The cost and manpower implications
 Return on Investment
 
 
 [5]
 The extent and timing of potential costs and savings, including the number of years, beginning with the date of completion of the closure or realignment, for the savings to exceed the costs
 Impacts
 
 
 [6]
 The economic impact on communities
 
 
 [7]
 The ability of both the existing and potential receiving communities' infrastructure to support forces, missions and personnel
 
 
 [8]
 The environmental impact
 
 
 [56]
 Fed.Reg. 6344 (Feb. 15, 1991)
 
 
 [15]
 Plaintiffs also argue that the Navy concealed all evidence favorable to the Shipyard and when the plaintiffs later obtained some of this information and called it to the Commission's attention, the Commission failed to reopen its public hearings to receive that information. This is said to violate § 2903(d)(1) which requires the Commission to hold hearings. If the argument is that § 2903(d)(1) required the Commission to receive all relevant information even that tendered after the close of a duly noticed public hearing, judicial review of that claim seems to us entirely consistent with the congressional intent reflected in the Act and its legislative history. By so holding, we do not, of course, endorse the proposition that the Commission's failure to reopen its hearings was in conflict with § 2903(d)(1). Plaintiffs also appear to contend that the Navy's concealment of evidence favorable to the Shipyard violated § 2903(c)(4) of the Act which requires the Secretary of Defense to "make available to the Commission and the Comptroller General of the United States all information used by the Department in making its recommendations." If this claim is that the Secretary of Defense failed to forward information considered by him in formulating his recommendations, that claim is reviewable. On the other hand, if this claim is that, because of the Navy's concealment, the Secretary of Defense failed to consider evidence that he should have considered, judicial review is not available
 
 
 [16]
 The Court in Baker held that an equal protection challenge to the apportionment scheme of the Tennessee General Assembly did not present a nonjusticiable political question
 
 
 [1]
 The defendants question whether this presumption applies because of the national security ramifications of base closing and realignment decisions
 
 
 [2]
 The majority states that "at least in one sense, we are here asked to review a presidential decision" (maj. at 945). As I interpret the complaint and the plaintiffs' brief, however, they seek review, not of Presidential action, but of actions taken by the named defendants, i.e., the Secretary of Defense, the Secretary of the Navy, the Defense Base Closure and Realignment Commission, and its members. Accordingly, I see no need to decide whether actions of the President are reviewable under the APA or under administrative "common law."
 Because the plaintiffs do not appear to seek review of Presidential action and because the defendants' actions would not have affected the plaintiffs if the President had not accepted the Commission's recommendations, it could be argued that the defendants' actions did not constitute "final agency action" under 5 U.S.C. § 704. I see no need to decide this question, however, because I conclude that the defendants' actions are not reviewable on other grounds.
 
 
 [3]
 See Defense Base Closure and Realignment Commission, Report to the President 1991 at v-vi [hereinafter Commission Report ]; Hanlon, Military Base Closings: A Study of Government by Commission, 62 U.Colo.L.Rev. 331, 336, 358 (1991)
 
 
 [4]
 See, e.g., Base Closure: Hearings on H.R. 1583 and H.R. 4481 on the Consolidation of Military Bases Before the Military Installations and Facilities Subcommittee and Defense Policy Panel of the House Committee on Armed Services, 100th Cong., 2d Sess. 349 (1988) (statement of Rep. Armey) [hereinafter Base Closure Hearings ]; Commission Report at 1-4
 
 
 [5]
 Defense Authorization Amendments and Base Closure and Realignment Act of 1988, Pub.L. No. 100-526 § 204(c), 102 Stat. 2623, 2627 (1988) [hereinafter 1988 Act]; Defense Base Closure and Realignment Act of 1990, Pub.L. No. 101-510, § 2905(c), 104 Stat. 1808, 1815 [hereinafter 1990 Act]
 
 
 [6]
 See also 137 Cong.Rec. H10143 (daily ed. Nov. 14, 1991) (in recommending certain amendments to the 1990 Act, the conferees on the 1991 amendments "reaffirm the view, expressed in the [Conference Report on the 1990 Act] that actions taken under the Act ... 'would not be subject to judicial review' "); 137 Cong.Rec. S17411 (daily ed. Nov. 22, 1991) (statement of Sen. Nunn that the conferees' 1991 statement had the same meaning as the passage in the 1990 Conference Report)
 
 
 [7]
 The Report stated (1990 Conf.Rep. at 705-707, 1990 U.S.C.C.A.N. at 3257-3259): "A new process involving an independent, outside commission will permit base closure to go forward in a prompt and rational manner.... [T]he new procedures would considerably enhance the ability of the Department of Defense to promptly implement proposals for base closures and realignment."
 
 
 [8]
 H.R.Rep. No. 735, 100th Cong., 2d Sess., pt. I, 8 (1988), reprinted in 1988 U.S.C.C.A.N. 3355, 3357
 
 
 [9]
 Id
 
 
 [10]
 See also Armey, Base Maneuvers--The Games Congress Plays with the Military Pork Barrel, Joint Hearings at 30, 35, reprinted from Policy Review, Winter 1988, at 70, 75 [hereinafter Base Maneuvers ]
 
 
 [11]
 Base Maneuvers at 72
 
 
 [12]
 Id
 
 
 [13]
 Base Closure Hearings, at 20-21 (statement of Rep. Armey quoting past statements by Senators Bumpers and Heinz); id. at 17 (statement of Rep. Armey) ("To put it bluntly, there is a widespread fear in Congress that an Administration with unrestricted base closure power may use that power as a political weapon to intimidate Congress."); id. at 349 (statement of Rep. Armey) ("[T]here is a fear that an Administration may use the threat to close particular military bases in order to influence the votes of members of Congress."). See also 1990 Conf.Rep. at 705, 1990 U.S.C.C.A.N. at 3257; H.R.Rep. 735, 100th Cong., 2d Sess., pt. II, 8-9, reprinted in 1988 U.S.C.C.A.N. at 3370, 3372 [hereinafter 1988 House Report pt. II]
 
 
 [14]
 See, e.g., 137 Cong.Rec. H6008 (daily ed. July 30, 1991) (statement of Rep. Weldon) ("I supported the base closing process in the legislation ... because I wanted to remove [the] politics of the process of closing bases, and I think to a large extent we have done that from the standpoint of Republican versus Democratic politics." ); id. at H6012 (statement of Rep. Snowe) ("This process was intended to remove the supposed evil of congressional politics from the base closure process." ); id. at H6038 (statement of Rep. Fazio) ("Many serious and legitimate concerns were raised as to the political nature of the base closure recommendations when Secretary Cheney released his first list in January 1990. Because of these concerns, Congress included legislation as part of the fiscal year 1991 Defense authorization bill which put in place a clear, objective, and fair process for closing bases."). The legislative history of the 1988 Act reflected similar views. See 1988 House Report pt. II at 9, 1988 U.S.C.C.A.N. at 3372 ("[P]olitical pressure has thwarted attempts to effect savings and efficiencies by shutting down unneeded facilities, and ... only by creating an expedited and automatic mechanism, insulated from the political pressures of the normal legislative process, will such savings be achieved.")
 
 
 [15]
 See Morrison, Caught Off Base, 21 Nat'l J. 801, 801 (1989) (quoting Rep. Aspin); Mills, Base Closings: The Political Pain Is Limited, 46 Cong.Q.Weekly Rep. 3625 (1988) (quoting Rep. Aspin). See also 137 Cong.Rec. H6022 (daily ed. July 30, 1991) (statement of Rep. Holloway); Mills, Challenge to Base Closings Fizzles on House Floor, 47 Cong.Q.Weekly Rep. 2062 (1989); Mills, Pain in Members' Home States Fails to Move Minds on Hill, 47 Cong.Q.Weekly Rep. 604 (1989); Towell, Hill Paves Way for Closing Old Base, 46 Cong.Q.Weekly Rep. 2999 (1988) ("[B]y forcing Congress to deal with the proposal as a package, the new procedure [made] it harder for members to cut deals to protect individual bases in their home districts against cutbacks.")
 
 
 [16]
 In providing for very limited NEPA review--of property disposal and relocation actions to be taken after a final closing or alignment decision (1990 Act § 2905(c)(3))--Congress imposed a very short (60-day) statute of limitations. No statute of limitations was prescribed for a suit of the type at issue here. This seems a clear indication that no such suits were contemplated